# Joint Appendix 2

USWGO
QANON // DRAIN THE SWAMP
MAKE AMERICA GREAT AGAIN



UNITED STATES DISTRICT COURT CASE NO. 1:13-CR-435-1
MIDDLE DISTRICT OF NORTH CAROLINA
United States Court of Appeals Case No. 20-6034
FOURTH CIRCUIT

Joint Appendix in attachment to Informal Brief in "No. 20-6034, US v. Brian Hill "



FILED
OCT 04 2019
Clerk, U.S. District Court

In the United States District Court
For the Middle District of North Carolina

| | | |
|---|---|---|
| **Brian David Hill,** | ) | |
| **Petitioner/Defendant** | ) | |
| | ) | **Criminal Action No. 1:13-CR-435-1** |
| **v.** | ) | |
| | ) | **Civil Action No. 1:17-CV-1036** |
| **United States of America,** | ) | |
| **Respondent/Plaintiff** | ) | |
| | ) | |
| | ) | |

## MOTION FOR SANCTIONS AND TO VACATE JUDGMENT IN PLAINTIFF'S/RESPONDENT'S FAVOR

## MOTION AND BRIEF / MEMORANDUM OF LAW IN SUPPORT OF REQUESTING THE HONORABLE COURT IN THIS CASE VACATE FRAUDULENT BEGOTTEN JUDGMENT OR JUDGMENTS

NOTICE: Due to the Motion to "Disqualify/Recuse Judge — Document #195" in regards to the Hon. Judge Thomas D. Schroeder, this motion should not be decided by that Judge but should be tried by another Judge of the bench. Due to the facts and allegations inside of this motion, it would be a conflict of interest for Judge Schroeder to render any decision on this motion.

Pursuant to the inherit power or implied power of the U.S. District Court (Courts §

18 - inherent or implied powers, Chambers v. NASCO, Inc., 501 U.S. 32, 44

(1991), Courts § 225.1; Equity § 47 - power to vacate fraudulent judgment) (See

**Supplement 1**, document printed from LexisNexis law library while at FCI-1

Butner in 2019), the Defendant/Petitioner Brian David Hill ("Brian D. Hill",

"Hill", "Brian", "Defendant"), proceeding Pro Se in this action, respectfully

requests that the Honorable U.S. District Court vacate a fraudulently begotten

judgment, the Document #122, filed: July 24, 2015, and the oral judgment on June

1

30, 2015 finding the Defendant/Petitioner in violation of Supervised Release conditions. On the basis of fraud upon the court, such judgment should be vacated.

The U.S. Probation Office in Greensboro (the petitioner for revocation) and through the United States Attorney Office for the Middle District of North Carolina had petitioned for revocation back in 2015 on a fraudulent basis and that such a basis had lacked merit.

Because the Hon. Judge Schroeder had used this June 30, 2015 fraudulently begotten judgment of violation in calculating a worse punishment of the Defendant/Petitioner in a future revocation hearing, Defendant/Petitioner can no longer stand by and allow the fraudulent begotten judgment of Document #122 and is requesting that the fraud be addressed, vacated as a matter of right of the Court through its inherit powers, and punish those who had engaged in the fraud against the Court and sanction them for the fraud or frauds against Defendant/Petitioner.

Defendant/Petitioner would like to request sanctions against the Government/Respondent/Plaintiff counsel Assistant U.S. Attorney ("AUSA") Anand Prakash Ramaswamy at the Greensboro NC Office, Lisa P. Palombo (deputy Chief U.S. Probation Officer), and Edward R. Cameron (Supervisory U.S. Probation Officer). The sanctions are on the basis of the fraud upon the court. The fraud is the perjury of U.S. Probation Officer ("USPO") Kristy L. Burton ("Burton") while testifying on the stand at the final revocation hearing of June 30, 2015 (See Transcript under Document #123). Also the false statements of USPO Burton that ended up as statements carried under penalty of perjury as stated in the Petition for revocation under Order for Warrant — Document #88, pushed by Edward R. Cameron.

2

## FACTS THAT REPRESENT THAT THE JUDGMENT ENTERED ON JUNE 30, 2019, AND THE WRITTEN JUDGMENT OF DOCUMENT #122 WAS BASED UPON A FRAUD UPON THE COURT BY BOTH THE U.S. PROBATION OFFICE AND THE UNITED STATES ATTORNEY

There is no basis to support the fact of judgment that "*Defendant did make threatening gestures toward the probation officer, Ms. Burton.*".

First of all, Defendant/Petitioner had apologized for having an autistic meltdown. Any behavioral expert would disagree with this analysis that an autistic meltdown is the same as making a willful and knowing threatening gesture and is incorrect. (See **Exhibit 1**, a report sourced from The Missouri Department of Mental Health).

This judgment criminalizes Autism Spectrum Disorder ("autism") and treats an autistic behavior the same as a willful criminal behavior of a person who does not exhibit any neurological or mental defect. Brian's autism is a neurological disorder, an impairment of the brain. See **Exhibit 2**, "Autism Spectrum Disorder Fact Sheet"; Prepared by: Office of Communications and Public Liaison, National Institute of Neurological Disorders and Stroke, National Institutes of Health in Bethesda, MD 20892.

From the record of that hearing on Page 26 of the transcript (Document #123) counsel Renorda Pryor's cross examination of witness Kristy L. Burton stated that "*he suffers from autism -- he has Autism Spectrum Disorder, and that there is difficulty -- he has difficulty understanding other people in social interactions which interferes with his ability to establish and maintain relationships. "Some individuals with Autism Spectrum Disorders have histories of aggressive behavior, particularly in situations where they are <u>emotionally overwhelmed, feel threatened, or do not have the language and social skills to respond more appropriately</u>.*""

3

USPO Burton's response was "*I read that statement, yes, but I don't feel that that's a guideline as to how to deal with it*."

So the real truth of the matter was that USPO Burton was not trained in how to deal with behaviors in Autism Spectrum Disorder, assuming that she is not lying over that matter. She did not understand how Autism works and clearly did not know how to properly supervise a criminal Defendant with Autism. This clearly shows incompetence and possibly unethical misconduct and a deficiency in the federal judicial system and its agencies. The need for judges and probation officers to criminalize and punish those with autism and throwing those with Autism into federal prisons without an understanding of how Autism works and what it is about. Congress may need to mandate Autism training for Federal Probation Officers and Federal Judges, or USPO Burton was making excuses for her incompetence by insisting on violating and punishing Petitioner/Defendant for a medical condition that he cannot help but having since his childhood.

Searching up the keywords "threat" or "threatening" inside of the Transcript ordered by family, Defendant/Petitioner cannot find that USPO Burton ever acknowledged orally or in writing of allegedly being threatened.

Defendant/Petitioner did not threaten to harm or kill USPO Burton. He was having a meltdown which would calm down once it normally ran its course. The meltdowns can be partially caused by overwhelming stress/anxiety caused from the wrongful conviction of Brian David Hill and being deprived of justice by the corrupt United States Attorney office who has been resisting Brian's effort to proving his actual innocence since he was originally charged. They violated Rule 3.8 and yet they never got in trouble and never faced consequences for their

4

corrupt actions because of the CORRUPTION of the United States Department of Justice (Justice Department, DOJ).

The frauds upon the court are simple, there was no mentioning of a "threat" or "threatening gesture" against USPO Kristy L. Burton from Danville, Virginia, except by the Hon. Judge Schroeder. That was an assumption and a conclusory allegation against Brian by the Chief Judge Thomas D. Schroeder, and is not grounded in fact. The fact that after Brian's meltdown, he did apologize to his Probation Officer and at least followed through with her conditions also proved there was no intent under "mens rea" to threaten the USPO Burton over an autistic meltdown caused by a neurological disorder. The "threat" fact cannot be established without any testimony or clear and convincing evidence proving such. An autistic meltdown is not evidence of an intentional threat.

Because the original judge had jumped to conclusions of a baseless claim of a "threatening gesture" over Brian's autism, it is not grounded in fact and is a fraud upon the court. Has no basis in fact. It is an incorrect assumption.

**Transcript cited from Page 30 of 84, Document #123:**

Q Did you -- okay. I just want to make sure I understand
why you feel that he failed to follow your instruction. I
believe that you also said that you were in fear of your life
on that day?
A I felt unsafe.
Q You felt unsafe. Did he throw something at you?
A He did not throw anything at me, no.
Q Did he jump towards you?
A No.
Q Did he stand up and maybe, you know, bolt toward you and
do anything that could have been aggressive to make you feel
that he was going strike you in any kind of way?
A He did not come towards me, no.

5

Q Okay. And you're saying that you felt unsafe or -- unsafe
that day because he called you a jerk?
A No, that's not what I am saying.

If her life was really in danger at all, she would have called the police instead of
walking away. She blew his autistic meltdown out of proportion and exaggerated
the situation in her benefit to protect herself from having to have been found to
being incompetent and not able to do her job properly without the training needed
to handle an autistic client. As for example, USPO Jason McMurray handles
Brian's autism and other disabilities differently than with Kristy Burton, and tries
to work with Brian and his family in making sure that he understands the
compliance with Supervised Release conditions. Jason McMurray had been treated
with respect and there had been no issues other than the infraction over the matter
of Brian's actual innocence statements to the treatment provider and the technical
state law violation that is still in the appeal process. USPO McMurray conducts his
supervision in a respectful, understanding, and compassionate manner.

The perjury of Kristy L. Burton, especially when it was three times, shows that the
witness may not have even been credible. It establishes that if two or three lies can
be told under oath, then what truths did Kristy L. Burton tell the court? Was there
any merit at all for the revocation hearing to even come to a judgment of violation
at all?

Read Declaration — Document #137, Memorandum — Document #145 (refer to
all issues involving Kristy L. Burton perjury), and Document #145-1, Filed
03/07/18 Pages 32 to 76.

The fact that USPO Burton would openly make false claims on the stand during
the hearing on June 30, 2015, is clearly an example of fraud upon the court. The

6

only witness of AUSA Anand Prakash Ramaswamy had gone and lied multiple times under oath. Yet she would lie enough to be taken on the record as a credible witness when she clearly demonstrated that she was incompetent and had felt or acted childish and had felt disrespected by Brian's words of "jerk" and "asshole" and may had decided to make up that she had felt unsafe, and then the judge had been deceived to believe that Brian had made threatening gestures towards his Probation Officer. That is not true and needs to be corrected on the record, respectfully.

There is a difference between a regular Probationer making threatening gestures towards an officer out of a disagreement and a Probationer that has had an autistic meltdown out of fear and anxiety. A panic attack is not threatening a Probation Officer? Being given immediate demands and then the Probationer with autism being subject to quick radical change causing him to sit on the chair and have a meltdown is not any intent to threaten the Probation Officer. It is entirely not factual at all to make assumptions about the "threatening gesture" conduct when autistic people are known not to socialize properly in society and may not make the appropriate gestures. There is intent when being accused of a crime or misconduct. Brian had no intent to threaten USPO Burton, and Brian has long-term or permanent medical conditions that exacerbate these issues. There is no reason at all to find that Brian was in any way, shape, or form, threatened his Probation Officer and is a fraud upon the court by the Government and its witness Kristy L. Burton.

When witnesses lie on the stand multiple times, they have no credibility in a court of law. In-fact the Defendant/Petitioner has the right to argue to this Court that the Government's entire position may lack merit "[r]egardless of the relevance of these [fraudulent] materials to the substantive legal issue in the case," this is enough to

7

"completely taint [the party's] entire litigation strategy from the date on which the abuse actually began").

"*if you catch the other side engaged in falsification, you can use it to argue that its entire position lacks merit.*"

See **Supplement 2**, "Responding to Falsification of Evidence" By Jonathan K. Tycko.

The facts is that Kristy L. Burton was behaving childishly and was incompetent, and she had attempted to cover up her incompetence by lying on the stand and lying as to the real reason why Brian had an autistic meltdown.

The "Petition for Warrant or Summons for Offender under Supervision" Document #88 had fraudulently asserted that the entire issue of what led to Brian supposedly becoming unhinged was over the Clerk's office directing him to cease texting the court officials and that he did not comply, and that when USPO Burton supposedly lectured Brian about ceasing that behavior he became visibly upset. All of that was a distortion of the facts of what had really happened. Brian was upset because he was told that he could not text his lawyer or anybody, and this was demanded without a court order stating that Brian was not allowed to text message. Communication is important to somebody with Autism Spectrum Disorder because they already have a deficiency in being able to socialize properly. What USPO Burton had attempted to do is similar to throwing a prisoner in solitary confinement, the same conditions of being excommunicated from the flock, excommunicated and separated from society. To tell somebody not to text message anybody anymore all for making the mistake of wrongfully texting the court, is a form of cruel and unusual punishment to somebody with Autism. Imagine you make a little mistake and you're thrown in solitary confinement and not be able to

socialize with others, some are driven insane, some eat feces/poo-poo and smear it all over the walls, some strip naked and yell or act crazy. It is like telling a mentally deficient person that he will not be allowed to socialize with anybody anymore and be treated the same as solitary confinement with the sole purpose of blocking the person from communication with others in society. The opposite of rehabilitation.

The purpose of the U.S. Probation Act of 1925, was meant to be rehabilitative to those released from prison. The purpose was to ensure that people live productive and good social lives, a life away from crime. USPO Burton was ordering that an already mentally deficient autistic person be further barred from the world of communication without setting a new condition and without allowing Brian to have a lawyer present to challenge such order, and then when USPO Burton demanded that Brian not be allowed to even text his lawyer, that could be construed as interfering with Brian's legal and constitutional right to effective assistance of counsel in the Sixth Amendment of the U.S. Constitution further adding constitutional deprivations to what Brian had already suffered throughout this case under severe structural defects of a Constitutional nature. The original law on Federal Probation should not be twisted and misinterpreted to become a prison without bars, a cheaper way to imprison somebody while calling it "Supervised Release" or "Probation" but is really a tool to instill control and fear upon the Probationer, fear that any little issue or screw-up can lead to a severe prison sentence or repercussions. Some may be deserved and some may not. Depends on circumstances and facts.

Brian did try to comply despite his Autistic meltdown. There is no intent to threaten his Probation Officer back in 2015, and she clearly lied to cover up her incompetency. She was clearly not equipped to handle Autistic behaviors and she

9

should have petitioned her boss to have a new Probation Officer assigned to Brian's case to supervise him (like Jason McMurray who has been supervising Brian without any personal issues for years, no conflicts of interest). Whatever her issue was, she clearly should not have lied three times under oath. That is perjury in violation of 18 U.S. Code § 1621. She was never arrested and indicted for her proven perjury. That problem comes from AUSA Anand Prakash Ramaswamy who was warned of her perjury and yet did nothing about it. He was warned a second time about her proven perjury and his response was filing a motion for pre-filing injunction to shut Brian up and aid to bar him from proving his innocence, another form of attempted excommunication or blockade from being able to express any legal issues or concerns involving the case while U.S. Probation Office in the future can try attempting to revoke his Supervised Release over and over again on any little allegation of "non-compliance".

Another fraud upon the court was that Document #88 stated and I quote that "*USPO Burton and Mr. Hill continued to discuss his issue with sending documents to the Court*". That never even happened. Brian, Roberta Hill, Stella Forinash, and Kenneth Forinash all knew that the issue had nothing to do with the issue of "*sending documents to the court*" which is his legal right when filing them properly through the postal service or hand delivery. The claims made under Document #88 had false statements and that itself is a fraud upon the court.

The fraud upon the court by the U.S. Probation Office is the statement in Document #88 giving the Court the impression that Brian was barred from any means of being allowed to file which would include but not limited to mailing documents to the Court and did not comply. That is a load of garbage and is a fraud upon the court.

10

Document #88: "*According to information provided by USPO Burton, on April 28, 2015, she visited Mr. Hill's residence to address <u>his sending numerous documents to the Court to be filed in his case</u>. <u>The U.S. District Court Clerk's Office had directed Mr. Hill to cease this behavior, however, he had not complied</u>. When USPO Burton attempted to address this issue with Mr. Hill, he became visibly upset. He began wringing his hands together and shaking his head. After USPO Burton instructed Mr. Hill to stop sending documents to the Court, he hit a plate off of a table beside a couch sending it to the floor*."

That is a distortion of the facts and differs from the facts on the record.

See Letter — Document #78: "Letter to BRIAN DAVID HILL regarding proper filing of court documents. (Daniel, J) (Entered: 04/24/2015)"

Stated on record that "*Please be advised that pursuant to the Court's Administrative and Policies Procedures, litigants not represented by counsel for a particular matter shall file pleadings on paper. In the future, please submit any documents you wish to have filed via hand delivery or by the U.S. Postal mail addressed to the Clerk of Court at 324 West Market Street, Greensboro, North Carolina 27401-2544.*"

"*After USPO Burton instructed Mr. Hill to stop sending documents to the Court, he hit a plate off of a table beside a couch sending it to the floor.*"

That statement is another fraud upon the court. The truth was brought out that it was over the issue of text messaging then Kristy L. Burton knew she had gone too far and covered up her original instruction that she verbally ordered Brian David Hill not to text message his lawyer, not to text message his friends or family, and that he couldn't text message anybody. This fraud upon the court is perjury and all

11

perjury statements by both Kristy L. Burton and her mirrored perjury to Edward R. Cameron who submitted the "Petition for Warrant" with false information and twisting the story to hide her incompetence, all of them need to face a reprimand for violation of United States criminal code.

That very letter from the Clerk's office had stated that Brian David Hill can still send documents to the court as long as it is properly filed by mailing or hand delivery. Document #88 made it sound as though Brian was getting upset with USPO Kristy L. Burton because she and the Clerk directed Brian not to file any documents at all with the Court (without a restriction order on filing, no filing injunctions at the time). That is the opposite of the facts in this case.

In fact Supervisory U.S. Probation Officer Edward R. Cameron was faxed one or more documents concerning the lies of Kristy L. Burton but were ignored. Edward Cameron was okay with lies and fraudulent information being typed up in government documents for the record at the U.S. Probation Office in Greensboro, NC. That may also violate the Obstruction of Justice federal law. At the Court's request, Brian is ready to expand the record by showing the extrinsic evidence of the fact that Edward Cameron was okay with the fraud upon the Court and okay with the perjury. That in itself is extrinsic evidence that Edward R. Cameron was informed of the fraud upon the court and permitted it. He should be held accountable too for this blatant abuse of supervisory power.

Even Renorda Pryor had conclusively by circumstance jumped on the fraud upon the court and went along with it by stating "*The only -- I think the only issue, as you heard on the stand from his mom, is that I explained to him he can't send any more letters to the Court, that he needs to use his attorney on that basis*"

12

That is a lie too that Attorney Renorda Pryor had reiterated. She basically went along with depriving Brian of his due process rights. Only a private attorney or Pro Se filer is able to file a 2255 Motion. If a private attorney does not want to file a 2255 Motion without charging a pile of money, then Brian's only option was filing Pro Se such as Document #125 and Document #128.

However Renorda also brought up truths that had needed to be reiterated, such as "*And when he did have the opportunity to calm down, he understood -- not only did he write it to the Court to apologize to Officer Burton, he also apologized to her by fax, I believe, as well as by phone.*"

That shows that Brian's autistic meltdown was not intentional but was a behavioral meltdown that is difficult to control once an emotional meltdown begins. Kristy L. Burton never said Brian made "threatening gestures" towards her. Brian stayed on the chair the whole time. Brian apologizing shows no intent of threat and no intent on non-compliance.

Another issue was that "*he missed one only because of transportation matters, but he's made every appointment.*" So Brian had a lawful excuse why he had missed an appointment at Piedmont Community Services.

It is erroneous that Judge Shroeder stated that "*I am going to find that the Defendant did make threatening gestures toward the probation officer, Ms. Burton. Now, there may be reasons that explain all of this, but the probation officers have to be able to meet with their clients, with the defendants, and be able to enforce the conditions of supervised release*". Brian apologizing after having an autistic behavioral meltdown should have been sufficient for USPO Burton to continue visiting Brian. If she did not want to handle supervising somebody with autism,

13

then she should have requested that another supervising officer conduct supervision of Brian Hill. Jason McMurray has had no issues with Brian telling his sex offender treatment provider that he is innocent and was wrongfully convicted due to ineffective counsel. Brian has every constitutional right to prove his actual innocence and should not be punished by the court for that. USPO Jason McMurray has handled the supervision a whole lot better than Kristy L. Burton. Her attitude and lies makes it quite clear that she disliked Brian and wanted to make his life a living hell to make an example out of him. USPO McMurray does not try to make Brian's life a living hell and enforces only the conditions he is required to enforce but respects Brian's right and ability to file a 2255 Motion and asking the Court to acknowledge his actual innocence. It is clear that Kristy L. Burton was incompetent and had made errors on her profession, unprofessional errors and misconduct, and that should have been noted on the record in this case.

Judge Schroeder's comment on "*Ms. Burton is credible*" is a fraud upon the court. Her multiple false statements on the stand under oath should subject Schroeder's factual finding that "*Ms. Burton is credible*" to collateral attack on the basis that she was not a credible witness, was incompetent and had attempted to hide her unprofessional misconduct by telling lies. That is not a correct statement of fact.

Judge Schroeder also put another controversial statement stating that "*I am not going to tolerate that kind of conduct. The probation officers don't deserve to be treated like that, and they can't work with the defendants who treat them like that.*"

Judge Schroeder didn't make that kind of comment on the September 12, 2019 final revocation hearing. Once the transcript comes out, it proves that U.S. Probation Officer Jason McMurray from Roanoke, Virginia wasn't given the same respect as with Kristy L. Burton. Judge Schroeder makes assumptions and gives

14

respect to those who testify against Brian and in favor of the Government. All totally one-sided. These issues of fraud, error, and assumptions, is exactly why Brian had filed the motion to "Disqualify/Recuse Judge — Document #195". It is clear that respect is shown to one officer over another. Assumptions were made and asserted as factual findings. It is an error of law. Kristy L. Burton was treated more respectfully by Judge Thomas D. Schroeder than Jason McMurray.

Judge Schroeder again asserts another false fact by stating "*Now, I credit Ms. Burton when she says she felt threatened enough that she was going to leave*." She never said she had felt threatened and the words "threat" searched on the Transcript only reveals that Renorda Pryor had argued that Brian had felt threatened.

Page 26, Document #123: "*Some individuals with Autism Spectrum Disorders have histories of aggressive behavior, particularly in situations where they are emotionally overwhelmed, feel threatened, or do not have the language and social skills to respond more appropriately*."

So the "threat conduct" was that if Brian was feeling "threatened" or emotionally overwhelmed (stressed, anxiety, thoughts of suicide) then it can trigger a meltdown or even self-harm. Kristy L. Burton never said she had felt threatened, never stated that Brian had threatened her. It is an error and a fraud upon the court. It is an error of the record regarding the facts in this case.

"*Okay. And based on your reading of the PSR, did you notice that it also stated that any time that there is an emotionally overwhelming situation or when Mr. Hill has felt --feel any threat -- threatened or anything like that, that he does tend to*

15

*have some aggressive behavior and not only him, but others in his type of -- that has the type of autism that he has also also has those type of things as well?"*

Again the only "feeling" of being "threatened" is in regards to Brian David Hill and not uttered by Kristy L. Burton and is not in regards to Kristy L. Burton.

Making facts based on raw assumptions instead of affidavits, testimony, expert witnesses, and other tangible credible evidence is in itself is false facts perpetuated on court record and is a fraud upon the court.

### ANALYSIS OF THE CASE LAW INVOLVING FRAUD UPON THE COURT

Various specific types of falsification violate federal criminal laws. See, e.g., 18 U.S.C. § 1621 (perjury punishable by up to five years' imprisonment); 18 U.S. Code § 1622 (subornation of perjury punishable up to five years' imprisonment); 18 U.S.C. § 1519 (knowing falsification or destruction of documents or other tangible objects punishable by up to 20 years' imprisonment); 18 U.S.C. § 1520 (destruction of certain corporate audit records punishable by up to 10 years of imprisonment). And knowing destruction or falsification of documents in an attempt to influence the outcome of a judicial proceeding also violates the general "obstruction of justice" law. 18 U.S.C. § 1503. See, e.g., U.S. v. Craft, 105 F.3d 1123, 1128 (6th Cir. 1997) ("Acts that distort the evidence to be presented or otherwise impede the administration of justice are violations of 18 U.S.C. § 1503. The act of altering or fabricating documents used or to be used in a judicial proceeding would fall within the obstruction of justice statute if the intent is to deceive the court."). All states have similar laws.

16

Citing: 501 U.S. 32, 44 (1991), G. RUSSELL CHAMBERS vs. NASCO, INC., 501 US 32, 115 L Ed 2d 27, 111 S Ct 2123, reh den 501 US 1269, 115 L Ed 2d, 1097, 112 S Ct 12, [No. 90-256], Argued February 27, 1991., Decided June 6, 1991.

"501 U.S. at 56–57; see also Synanon Found., Inc. v. Bernstein, 517 A.2d 28, 43(D.C. 1986) (once a party embarks on a "pattern of fraud," and "[r]egardless of the relevance of these [fraudulent] materials to the substantive legal issue in the case," this is enough to "completely taint [the party's] entire litigation strategy from the date on which the abuse actually began")."

The perjury of Kristy L. Burton and the subornation of perjury by Anand Prakash Ramaswamy shows that they are willing to deceive the Court in an attempt to punish and revoke the Supervised Release of Defendant/Petitioner and be able to use that violation as leverage to push for the maximum imprisonment if the Defendant/Petitioner is ever accused of another violation of Supervised Release condition. AUSA Ramaswamy is willing to do whatever it takes to win every case, whether it is by persuading every criminal defendant to accept a plea agreement and accepting the basis of questionable evidence submitted to the Grand Jury, or even by twisting the facts and/or distorting the truth and/or outright lying. He continues to ignore N.C. State Bar Rule 3.8.

There is no established fact that Brian's autistic meltdown can be construed as to being a willful and intent of a threatening gesture against Brian's Probation Officer when the truth is that Kristy L. Burton had perjured herself to protect herself from appearing incompetent and ignorant in any kind of training to be able to deal with an autistic probationer. It is not Brian's fault, but it is the Probation Officer's fault for lack of training on Autism, Congresses lack of legal statutory authority to

17

mandate that the U.S. Probation Office receive autism training, and the lack of the
Government's ability to understand Autism to the extent where situations can be
handled better or differently. It is not Brian who failed the Probation Office back in
2015, but the Probation Office who had failed Brian.

The Court has the authority to reverse the judgments that are based upon frauds
upon the court. Fact frauds, testimony frauds (perjury, lying, false statements) and
document frauds such as submitting any official government or court documents
with false information. It must be corrected to protect the integrity of the judiciary.

See Breezevale Ltd. v. Dickinson, 879 A.2d 957, 964 (D.C. 2005)(affirming
sanction of dismissal where top executives of plaintiff company engaged in scheme
to forge documents and subsequently denied the forgery in pleadings and sworn
testimony); Synanon Found., Inc. v. Bernstein, 503 A.2d 1254, 1263 (D.C.
1986)(affirming sanction of dismissal where plaintiff, inter alia, destroyed
audiotapes and made false statements to the court "that no responsive documents
could be found" in order "to deceive the court, and to improperly influence the
court in its decision on the defendants' motions to compel, with the ultimate aim of
preventing the judicial process from operating in an impartial fashion"); Cox v.
Burke, 706 So. 2d 43 (Fla. Dist. Ct. App. 1998) (affirming sanction of dismissal
where plaintiff gave false answers to interrogatories and deceptive deposition
testimony); Pope v. Fed. Express Corp., 974 F.2d982, 984 (8th Cir. 1992)
(affirming sanction of dismissal for plaintiff's forgery of, and reliance on, a single
document); Aoude v. Mobil Oil Corp., 892 F.2d 1115 (1st Cir.1989) (affirming
dismissal where plaintiff concocted a single document); Tramel v. Bass, 672 So. 2d
78, 82 (Fla. Dist. Ct. App.1996) (affirming default judgment against defendant
who excised damaging six-second portion of videotape before producing it during
discovery).

A court also may impose additional monetary sanctions—in the form of fines or punitive damages—above and beyond the specific amount of the innocent party's fees and expenses.

Jemison v. Nat'l Baptist Convention, 720 A.2d 275, 285 (D.C. 1998) (punitive damages may be imposed if court finds that bad faith litigator acted with malice).

AUSA Ramaswamy did not want to address or refused to address the substantial evidential issues of Kristy L. Burton committing perjury but instead moved to suppress Defendant's/Petitioner's right to file pleadings with the pre-filing injunction motion.

Again citing: Declaration — Document #137, Memorandum — Document #145 (refer to all issues involving Kristy L. Burton perjury), and Document #145-1, Filed 03/07/18 Pages 32 to 76.

Ramaswamy had refused to address the allegations themselves of the perjury and did not want to correct the falsehoods but instead had pushed for a pre-filing injunction to prevent Brian from further exposing his misconduct (Documents #148 and #149). That makes Ramaswamy liable for subornation of perjury under 18 U.S. Code § 1622 (subornation of perjury punishable up to five years' imprisonment), the fact that he is okay with the very perjury he was made aware of. So AUSA Ramaswamy may had decided to commit one or more violations of United States law in order to deceive the Court into violating Brian's Supervised Release conditions.

It doesn't matter what the "relevance of these [fraudulent] materials to the substantive legal issue in the case" are because the Plaintiff/Respondent had allowed these lies to be used and abused on court record in order to make Brian's

19

probation at higher risk of a higher prison sentence if the Defendant/Petitioner is ever accused of a violation in the future (including technical violations in nature). The lies should have been corrected after Ramaswamy and the Court was made aware of the lies of Kristy L. Burton, U.S. Probation Officer of the U.S. Probation Office in Danville, Virginia. Because they were not corrected after being conducted over the substantive issue, but instead had pushed for a pre-filing injunction last year, shows a malicious prosecutor's intent upon wrongfully incarcerating Defendant/Petitioner, evidence and witnesses don't even matter.

More frauds upon the court will be brought up from the September 12, 2019 final revocation hearing after receipt of the Transcript. Defendant/Petitioner shall push for vacating that Judgment at a later time, and will also push for default judgment of the 2255 Motion on the ground of actual innocence as a matter of law or matter of constitutional right and based upon the Government's repeated pattern of frauds upon the court. The 2255 statutory filing deadlines do not block a Defendant's/Petitioner's ability to petition a court to vacate a fraudulent begotten Judgment. A Judgment is not subject to finality where there is any evidence of a fraud upon the court that led to such judgment.

Defendant asks that the Honorable Court consider vacating the fraud begotten oral judgment of June 30, 2015, and vacating the fraud begotten written judgment under Document #122, filed: Jul 24, 2015, "ORDER Supervised Release Violation Hearing signed by JUDGE THOMAS D. SCHROEDER on 7/23/2015. Defendant's supervised release is not revoked and the Defendant is to remain on supervised release. The Defendant shall participate in a cognitive behavioral treatment program and location monitoring home detention program as set out herein. All other terms and conditions of supervised release as previously imposed remain in full force and effect in case as to BRIAN DAVID HILL (1). (Daniel, J)".

20

WHEREFORE, Brian prays for relief that the fraudulent begotten Judgments concerning the Supervised Release Violation of 2015 be vacated or set aside, and be stricken from the record unless such evidence must remain on the record to further prove a repeated pattern of fraud upon the court by the Government for the 2255 case when Brian pushes for default judgment.

WHEREFORE, Brian prays that any judgments adverse to Defendant/Petitioner and favorable to the Government in the future that had cited the violation charge from 2015 to also be modified, corrected, or reconsidered to address the frauds upon the court and not use them against Defendant/Petitioner who is a victim of such frauds by the adversary.

### The sanctions Defendant/Petitioner are requesting are as followers:

WHEREFORE, Defendant/Petitioner prays that the Court vacate and reverse the fraudulent begotten judgment entered under Document #122;

WHEREFORE, Defendant/Petitioner prays that the Court consider reversing, vacating, nullifying, setting aside, or even striking any other Judgments in favor of the United States of America (Respondent/Plaintiff) when they had used any frauds upon the court to obtain favorable judgment;

WHEREORE, Defendant/Petitioner prays that he be reimbursed for any or all legal expenses that was necessary to defend against such frauds and the expenses can be simple things such as postage for legal mailings and paper and printer ink and/or any other resources necessary, and be reimbursed for any emotional damages caused by the adverse party.

21

WHEREORE, Defendant/Petitioner prays that the Court hold Lisa P. Palombo (deputy Chief U.S. Probation Office), and Edward R. Cameron (Supervisory U.S. Probation Officer) accountable for perjury (or subornation of perjury), unethical or unprofessional misconduct, and fraud or frauds being pushed through the Petition for revocation under Document #88.

WHEREFORE, Defendant/Petitioner prays that Kristy L. Burton be charged with perjury and that the judge recommend that she be charged with perjury.

WHEREFORE, Defendant/Petitioner prays that the Court sanction AUSA Ramaswamy for misconduct including violation of state bar Rule 3.8.

WHEREFORE, Brian prays that he receives any other relief that the Court deems as necessary and proper.

### Attached evidence

**Supplement 1:** Document printed from LexisNexis law library while at FCI-1 Butner in 2019, in regards to the inherit powers of the Court and the issues of fraud upon the court. **Total of 4 pages.**

**Supplement 2:** "Responding to Falsification of Evidence" By Jonathan K. Tycko. Research article by a lawyer in regards to the issues of perjury, falsification of evidence, destruction of evidence, and fraud upon the court by a party in a case. **Total of 5 pages.**

Total is 11 pages of attachment including Supplement marker pages.

### Declaration of Brian David Hill on attached evidence

I, Brian David Hill, declare pursuant to Title 28 U.S.C. § 1746 and subject to the penalties of perjury, that the following is true and correct:

22

1. Attached hereto as <u>Exhibit 1</u>, is a true and correct photocopy of a report titled "Autism Spectrum Disorders" sourced from The Missouri Department of Mental Health. **Total of 38 pages.**

2. Attached hereto as <u>Exhibit 2</u>, is a true and correct photocopy of a printout of "Autism Spectrum Disorder Fact Sheet"; Prepared by: Office of Communications and Public Liaison, National Institute of Neurological Disorders and Stroke, National Institutes of Health in Bethesda, MD 20892. "All NINDS-prepared information is in the public domain and may be freely copied. Credit to the NINDS or the NIH is appreciated." This did not come from Wikipedia. **Total of 9 pages.**

Total is 49 pages of attachment including Exhibit marker pages.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 2, 2019.

Respectfully submitted,

*Brian D. Hill*
~~Signed~~                    Signed
Brian D. Hill (Pro Se)
310 Forest Street, Apartment 1
Martinsville, Virginia 24112
Phone #: (276) 790-3505

**U.S.W.G.O.**

Former U.S.W.G.O. Alternative News reporter
I stand with QANON/Donald-Trump – Drain the Swamp
I ask Qanon and Donald John Trump for Assistance (S.O.S.)
Make America Great Again

23

Respectfully filed with the Court, this the 2nd day of October, 2019.

New World Order - Checkmate!
Ramaswamy - Checkmate!
Q WWG1WGA
Drain The Swamp

Respectfully submitted,

*Brian D. Hill*
~~Signed~~
Signed
Brian D. Hill (Pro Se)
310 Forest Street, Apartment 1
Martinsville, Virginia 24112
Phone #: (276) 790-3505



Former U.S.W.G.O. Alternative News reporter
I stand with QANON/Donald-Trump – Drain the Swamp
I ask Qanon and Donald John Trump for Assistance (S.O.S.)
Make America Great Again

Petitioner also requests with the Court that a copy of this pleading be served upon the Government as stated in 28 U.S.C. § 1915(d), that "The officers of the court shall issue and serve all process, and preform all duties in such cases. Witnesses shall attend as in other cases, and the same remedies shall be available as are provided for by law in other cases". Petitioner requests that copies be served with the U.S. Attorney office of Greensboro, NC via CM/ECF Notice of Electronic Filing ("NEF") email, by facsimile if the Government consents, or upon U.S. Mail. Thank You!

CERTIFICATE OF SERVICE

24

Petitioner hereby certifies that on October 2, 2019, service was made by mailing the original of the foregoing:

"MOTION FOR SANCTIONS AND TO VACATE JUDGMENT IN PLAINTIFF'S/RESPONDENT'S FAVOR -- MOTION AND BRIEF / MEMORANDUM OF LAW IN SUPPORT OF REQUESTING THE HONORABLE COURT IN THIS CASE VACATE FRAUDULENT BEGOTTEN JUDGMENT OR JUDGMENTS"

by deposit in the United States Post Office, in an envelope (certified mail), Postage prepaid, on October 2, 2019 addressed to the Clerk of the Court in the U.S. District Court, for the Middle District of North Carolina, 324 West Market Street, Greensboro, NC 27401.

Then pursuant to 28 U.S.C. §1915(d), Petitioner requests that the Clerk of the Court move to electronically file the foregoing using the CM/ECF system which will send notification of such filing to the following parties to be served in this action:

| | |
|---|---|
| Anand Prakash Ramaswamy<br>U.S. Attorney Office<br>Civil Case # 1:17 -cv-1036<br>101 South Edgeworth Street, 4th<br>Floor, Greensboro, NC 27401<br>Anand.Ramaswamy@usdoj.gov | Angela Hewlett Miller<br>U.S. Attorney Office<br>Civil Case # 1: 17 -cv-1036<br>101 South Edgeworth Street, 4th<br>Floor, Greensboro, NC 27401<br>angela.miller@usdoj.gov |
| JOHN M. ALSUP<br>U.S. Attorney Office<br>101 South Edgeworth Street, 4th<br>Floor, Greensboro, NC 27401<br>john.alsup@usdoj.gov | |

This is pursuant to Petitioner's "In forma Pauperis" ("IFP") status, 28 U.S.C. §1915(d) that "The officers of the court shall issue and serve all process, and perform all duties in such cases ... "the Clerk shall serve process via CM/ECF to serve process with all parties.

| Date of signing:<br>*October 2, 2019* | Respectfully submitted,<br>*Brian D. Hill*<br>*Signed*                    Signed |
|---|---|

|  |  |
|---|---|
| *October 2, 2019* | Brian D. Hill (Pro Se)<br>310 Forest Street, Apartment 1<br>Martinsville, Virginia 24112<br>Phone #: (276) 790-3505<br>**U.S.W.G.O.**<br>I stand with QANON/Donald-Trump – Drain the Swamp<br>I ask Qanon and Donald John Trump for Assistance (S.O.S.)<br>Make America Great Again |

I ask Department of Defense ("DOD") military Constitutional oath keepers, alliance, Qanon for help in protecting me from corruption and criminal behavior of Government.

Certified Mail tracking no: 7015-0640-0006-0646-2519

Friend's justice site: JusticeForUSWGO.wordpress.com

*No New World Order!*
*No Phil Berger Dictator!*

26

# Supplement 1

USWGO
QANON // DRAIN THE SWAMP
MAKE AMERICA GREAT AGAIN



UNITED STATES DISTRICT COURT CASE NO. 1:13-CR-435-1
MIDDLE DISTRICT OF NORTH CAROLINA

Supplement in attachment to "MOTION FOR SANCTIONS AND TO VACATE
JUDGMENT IN PLAINTIFF'S/RESPONDENT'S FAVOR -- MOTION AND BRIEF /
MEMORANDUM OF LAW IN SUPPORT OF REQUESTING THE HONORABLE
COURT IN THIS CASE VACATE FRAUDULENT BEGOTTEN JUDGMENT OR
JUDGMENTS"

| 115 LED2D 27, 501 US 32  CHAMBERS v NASCO, INC. |
|---|

### G. RUSSELL CHAMBERS, Petitioner
*vs.*
### NASCO, INC.

**501 US 32, 115 L Ed 2d 27, 111 S Ct 2123, reh den 501 US 1269, 115 L Ed 2d
1097, 112 S Ct 12**

[No. 90-256]

**Argued February 27, 1991.**

**Decided June 6, 1991.**

### DECISION

Federal District Court, in diversity case, held to have properly invoked its inherent power in assessing attorneys' fees as sanction for party's bad-faith conduct in course of litigation.

### SUMMARY

The owner of a television station in Louisiana agreed to sell the station's facilities and broadcast license to a corporation, but he later refused to consummate the sale. The corporation notified the owner's attorney of the corporation's intention to file a diversity suit in the United States District Court for the Western District of Louisiana to seek specific performance of the agreement and a temporary restraining order to prevent the alienation or encumbrance of the properties at issue. On the day before the suit was to be filed, the owner and his attorney attempted to place the properties beyond the District Court's reach by creating a trust, of which the trustee and beneficiaries were the owner's family members, and causing the properties to be conveyed to the trust. The attorney withheld this information from the District Court, which subsequently granted a preliminary injunction against the owner and warned the owner and the attorney that their conduct had been unethical. However, the owner proceeded to defy the preliminary injunction, file meritless motions and pleadings, and engage in delaying actions. After

LED2                                    1

© 2018 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

the trial in the District Court but before the entry of judgment, the owner-acting in direct contravention of the District Court's orders to maintain the status quo pending the outcome of the litigation-attempted to gain the Federal Communications Commission's permission to build a new transmission tower and to relocate the transmission facilities to that site. The owner withdrew the application after the corporation sought contempt sanctions. The District Court, finding that the transfer of the properties to the trust was a simulated sale and that the deeds purporting <*pg. 28> to convey the property were of no effect, entered judgment in favor of the corporation (623 F Supp 1372). The United States Court of Appeals for the Fifth Circuit, affirming the District Court's judgment, found the owner's appeal frivolous, imposed appellate sanctions, and remanded the case to the District Court with orders to fix the amount of appellate sanctions and to determine whether further sanctions should be imposed for the manner in which the litigation had been conducted (797 F.2d 975). On remand, the District Court (1) determined that further sanctions were appropriate; (2) declined to impose sanctions under Rule 11 of the Federal Rules of Civil Procedure-which provides for the imposition of attorneys' fees as a sanction for the improper filing of papers with a court-on the grounds that Rule 11 did not reach the owner's out-of-court conduct, and that it would have been impossible to assess sanctions at the time of the owner's improper filing of papers because the falsity of the pleadings was not yet apparent at that time; (3) declined to impose sanctions under 28 USCS § 1927-under which an attorney who multiplies the proceedings in any case unreasonably and vexatiously may be required to satisfy personally the attorneys' fees reasonably incurred because of such conduct-on the ground that the statute did not apply to the owner himself and was not broad enough to reach all the misconduct; (4) invoked the District Court's own inherent power in imposing sanctions; and (5) assessed the owner for the entire amount of the corporation's litigation costs paid to its attorneys (124 FRD 120). The Court of Appeals, affirming, (1) held that the District Court had not abused its discretion in awarding the attorneys' fees to the corporation, and (2) rejected the argument that a federal court sitting in a diversity case must look to state law, not the court's inherent power, to assess attorneys' fees as a sanction for bad-faith conduct in litigation (894 F.2d 696).

On certiorari, the United States Supreme Court affirmed. In an opinion by White, J., joined by Marshall, Blackmun, Stevens, and O'Connor, JJ., it was held that (1) a federal court has inherent power to assess attorneys' fees as a sanction for a party's bad-faith conduct in the course of litigation; (2) this inherent power is not displaced by the sanctioning scheme of 28 USCS § 1927 and the various sanctioning provisions in the Federal Rules of Civil Procedure; (3) under the circumstances presented, the District Court did not abuse its discretion in resorting to its inherent power without first invoking the federal sanctioning provisions; (4) the District Court, sitting in a diversity case, properly used its inherent power, notwithstanding that the law of Louisiana provided, as a general rule, that attorneys' fees were not to be awarded to a successful litigant, given that (a) Louisiana's general rule did not embody a substantive policy, but rather focused on the award of attorneys' fees due to a party's success on the underlying claim, (b) the District

LED2                                          2

© 2018 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Court, in assessing attorneys' fees against the owner for fraud and bad-faith conduct, did not attempt to sanction the owner for breach of contract, and thus the fee-shifting was not a matter of substantive remedy, but rather was a matter of vindicating judicial authority, and (c) under such circumstances, the District Court's inherent power could not be made subservient to any state policy without transgressing the boundaries set out in Erie R. Co. v Tompkins (1938) 304 US 64, 82 L Ed 1188, 58 S Ct 817,<*pg. 29> and subsequent United States Supreme Court decisions with respect to the applicability of state law in federal diversity cases; and (5) under the circumstances, the District Court acted within its discretion in assessing as a sanction the entire amount of the corporation's attorneys' fees at the conclusion of the litigation.

Scalia, J., dissenting, expressed the view that (1) a Federal District Court's inherent power does not reach conduct beyond the court's confines that does not interfere with the conduct of the trial, (2) the District Court appeared to have imposed sanctions for the owner's breach of contract, and (3) the District Court had no power to do so.

Kennedy, J., joined by Rehnquist, Ch. J., and Souter, J., dissenting, expressed the view that (1) a federal court must rely, where possible, on express federal sanctioning provisions rather than on its inherent power to sanction bad-faith misconduct, and (2) the District Court acted improperly in (a) failing to rely on the federal sanctioning provisions, and (b) allowing sanctions to be awarded for the owner's prelitigation breach of contract.<*pg. 30>

## RESEARCH REFERENCES

20 Am Jur 2d, Costs §§ 74, 75, 78; 20 Am Jur 2d, Courts §§ 78, 79

8 Federal Procedure, L Ed, Courts and Judicial System §§ 20:324-20:326, 20:337, 20:339, 20:347

2 Am Jur Proof of Facts 233, Attorneys' Fees

28 USCS § 1927; USCS Court Rules, Federal Rules of Civil Procedure, Rule 11

L Ed Digest, Appeal § 1424; Costs and Fees § 33; Courts § 549.5

L Ed Index, Attorneys' Fees; Discretion of Court; District Courts and Judges; Erie Doctrine; Fee Shifting; Frivolous Matters; Rules of Civil Procedure

Index to Annotations, Attorneys' Fees; Civil Procedure Rules; Discretion of Court; District Courts; Erie Doctrine; Vexatious Litigation

LED2                                    3

© 2018 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

## Courts § 18 - inherent or implied powers

5. Certain implied powers must necessarily result to courts of justice from the nature of their institution, powers which cannot be dispensed with in a court because they are necessary to the exercise of all others; such powers are governed not by rule or statute, but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases; courts of justice are vested, by their very creation, with power to impose silence, respect, and decorum in their presence, and submission to their lawful mandates.

## Attorneys § 6 - power of courts

6. Although a court's power to control admission to its bar and to discipline attorneys who appear before it ought to be exercised with great caution, such power is incidental to all courts.

## Contempt § 26 - court's power to punish

7. The power to punish for contempt is inherent in all courts; this power reaches both conduct before the court and that beyond the court's confines, for the underlying concern that gives rise to the contempt power is not merely the disruption of court proceedings, but rather disobedience to the orders of the judiciary, regardless of whether such disobedience interferes with the conduct of trial. (Scalia, J., dissented in part from this holding.)

## Courts § 225.1; Equity § 47 - power to vacate fraudulent judgment

8. A federal court has the inherent power to vacate its own judgment upon proof that a fraud has been perpetrated upon the court; this historic power of equity to set aside fraudulently begotten judgments is necessary to the integrity of the courts; moreover, a federal court has the power to conduct an independent investigation in order to determine whether the court has been the victim of fraud.

LED2                                              1

© 2018 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

# Supplement 2

USWGO
QANON // DRAIN THE SWAMP
MAKE AMERICA GREAT AGAIN



UNITED STATES DISTRICT COURT CASE NO. 1:13-CR-435-1
MIDDLE DISTRICT OF NORTH CAROLINA

Supplement in attachment to "MOTION FOR SANCTIONS AND TO VACATE
JUDGMENT IN PLAINTIFF'S/RESPONDENT'S FAVOR -- MOTION AND BRIEF /
MEMORANDUM OF LAW IN SUPPORT OF REQUESTING THE HONORABLE
COURT IN THIS CASE VACATE FRAUDULENT BEGOTTEN JUDGMENT OR
JUDGMENTS"

# Responding to Falsification of Evidence

*By Jonathan K. Tycko*

Courts often describe the litigation process as having a truth-seeking function. Under duress, however, most lawyers experienced in litigation will concede that the litigation process serves that function only imperfectly. Although trials are intended to recreate for the judge and jury the historical events at issue in the case, numerous very serious obstacles to achieving that goal exist. Some of those obstacles are the result of the passage of time: memories fade, witnesses die, evidence is lost or discarded. Some of those obstacles are the result of rules or procedures intended to serve competing interests: relevant information is hidden behind privileges and other evidentiary rules, witnesses are beyond the subpoena power of the court, only finite amounts of evidence can be presented in the time allotted for the trial. And some of those obstacles are a function of the human condition: lawyers are possessed of unequal persuasive skills, perceptions of judges and juries are influenced by events outside the courtroom, people make mistakes. These obstacles to truth seeking are all, more or less, tolerated by our legal system. Indeed, addressing these various categories of obstacles is an important part of the day-to-day work of judges, juries, and lawyers.

But another, more pernicious, obstacle to truth seeking sometimes rears its ugly head. Parties lie under oath, forge documents or create other types of deceptive evidence, and destroy or hide relevant evidence. This conduct is intentional and designed to subvert the truth-seeking function of the judicial process. This type of intentional creation, alteration, or destruction of evidence—which I will refer to generally as falsification—is the narrow subject of this article.[1] This article will begin with a brief discussion of the nature and extent of the problem.

Then, the article will list and discuss various available responses when an opposing party engages in falsification in the context of civil litigation.

## The Problem of Falsification

Falsification is a serious problem, for two reasons. First, when it occurs, it can have an enormously detrimental impact on the litigation process. Most obviously, undetected falsification can lead directly to incorrect results. In criminal cases, innocent people can be imprisoned or criminals can go unpunished. And in civil cases, large sums of money or important legal rights can be undeservedly lost or won.

But falsification has other deleterious effects. Where one side of a dispute suspects the other of engaging in falsification, it can result in litigation that is much more expensive and time-consuming, for both the parties and the courts, because falsification often adds a fact-intensive issue (e.g., if the documents are forgeries) that can require additional discovery, expenses for various types of forensic experts, and increased trial time. In addition, falsification erodes public respect for the judicial system: to the extent that the public believes falsification is common, it will distrust the results reached by the judicial system and will lose faith in courts as reliable sources of justice.

The seriousness of falsification is reflected both by the numerous remedies that courts have developed to address it (many of which will be discussed below) and also by the legislative response. Falsification is a serious crime in most, if not all, jurisdictions.[2] And falsification can result in more severe punishment for otherwise-criminal conduct. For example, under the federal sentencing guidelines, a sentence is subject to significant "enhancement" if "the offense (A) involved the destruction, alteration, or fabrication of a substantial number of records, documents, or tangible objects; (B) involved the selection of any essential or especially probative record, document, or tangible object, to destroy or alter; or (C) was otherwise extensive in scope, planning, or preparation."[3]

Second, falsification occurs with alarming frequency. No good statistics on falsification exist, and indeed, it is hard to imagine how accurate statistics could be compiled, given the diverse ways falsification occurs and the lack of any comprehensive reporting system. But as one appellate judge accurately noted, "[i]n the centuries that have elapsed since Adam took that first bite of the apple in the Garden of Eden, a great many people, some of them powerful and famous, have been found to have lied under oath or to have otherwise done their best to conceal the truth and to subvert judicial proceedings."[4] In 1995, the *ABA Journal* conducted a survey of 50 federal and state judges and reported that most "agree[d] that perjury in some form permeates civil and criminal courts."[5] Numerous reported cases reflect instances of falsification and the legal system's attempts to grapple with it. And this author's own personal experience is that falsification occurs in a significant portion of civil cases; I have personally been involved in a number of significant cases in which I came to believe that one of the parties had intentionally forged or altered documents, and I often encounter trial and deposition testimony that I believe to be intentionally false or misleading. My discussions with other lawyers lead me to conclude that my perceptions are not unique but rather are very common among experienced litigators.

## Responding to Falsification by an Opposing Party

Falsification is often a crime, but it rarely is prosecuted. So, a litigant faced with falsification by an opposing party is left to seek remedies directly from the courts. Numerous responses to falsification are available. The most common of these potential responses will now be

1 • Committee on Corporate Counsel Newsletter • American Bar Association • Winter 2006 • Volume 20 • Number 2
"Responding to Falsification of Evidences" by Jonathan K. Tycko, published in Committee on Corporate Counsel Newsletter, Volume 20, No.2, Winter 2006 © 2006 by the American Bar Association. Reproduced by permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

addressed. They are presented briefly and primarily as a guide to what should at least be considered by a lawyer faced with the problem. The law in each jurisdiction may differ on these issues; therefore, local law research may be required before deciding on appropriate steps. The responses discussed below are presented in no particular order.

*Seek Dismissal or Default*
If an opposing party has engaged in falsification, one potential response is to ask the court to throw the party out of court. Courts have long recognized their own inherent power to protect themselves and other parties from various forms of bad faith litigation, including the falsification of evidence. As the Supreme Court emphasized in *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, this inherent power is a crucial mechanism for protecting the integrity of the judicial process:

> [T]ampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. . . . The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.[6]

The inherent power to "fashion appropriate sanction[s] for conduct which abuses the judicial process" was reaffirmed by the Supreme Court in *Chambers v. NASCO, Inc.*[7]
Where falsification occurs in the midst of ongoing judicial proceedings, and is specifically directed at affecting those proceedings, it often is termed "fraud on the court." A court, as an exercise of this inherent authority, may sanction fraud on the court through dismissal (if the falsifier is the plaintiff) or default (if the falsifier is the defendant).[8] But because dismissal or default is a severe sanction that deprives a litigant entirely of the right to pursue or defend a claim, courts have adopted various standards to ensure that it is imposed sparingly and that "the need to maintain institutional

integrity and the desirability of deterring future misconduct" is balanced appropriately against "the policy favoring adjudication on the merits."[9]
Courts have adopted three primary safeguards to ensure that the sanction of dismissal or default is imposed only in appropriate cases. First, most courts that have considered the issue have concluded that fraud on the court must be proved by clear and convincing evidence—a standard of proof higher than the preponderance of the evidence standard that normally applies in civil cases—before it can be punished through an exercise of inherent power.[10] Second, the party accused of falsification must be given notice of the potential sanctions and an opportunity to respond; however, whether to conduct a full evidentiary hearing is a matter generally left to the discretion of the court.[11] And third, as a general matter, a court must

> To hold a party or witness in contempt, the court must have judicial knowledge of the perjury.

consider lesser sanctions before imposing the sanction of dismissal or default. Some of those lesser sanctions—such as awards of attorney fees or adverse findings on particular issues—are discussed below. But some courts also have recognized that falsification can be so serious an affront to the judicial system that a court can impose the sanction of dismissal or default even *without* first considering or imposing lesser sanctions. For example, in *Oliver v. Gramley*, the Seventh Circuit upheld a sanction of dismissal where the plaintiff had submitted a false affidavit relating to the filing and service of a habeas petition, even though the district court had not explicitly considered less severe sanctions. Judge Posner, writing for the court, concluded

that this falsification was "so egregious, inexcusable, and destructive that no lesser sanction than dismissal with prejudice could be adequate."[12]
In addition to inherent powers, courts may also have authority to impose the sanction of dismissal or default under various procedural rules. For example, Rule 37 of the Federal Rules of Civil Procedure provides an alternative basis for a court's authority to impose the sanction of dismissal or default, where the falsification amounts to a "fail[ure] to comply with the rules of discovery or with court orders enforcing those rules."[13] And Rule 11 of the Federal Rules of Civil Procedure provides similar authority where a party's falsification manifests itself as false allegations or denials in the party's pleadings.[14] Accordingly, when faced with falsification in ongoing civil litigation—particularly in the pretrial phases of the case—a lawyer should carefully consider whether any of the rules of the court before which the case is pending provide an alternative basis for sanctions.

*Seek Recovery of Monetary Sanctions*
All of the various sources of a court's authority to impose the sanction of dismissal or default also permit a court to impose monetary sanctions. The most common form of monetary sanction is an award of the attorney fees and expenses incurred by the other side of the case. The fees and expenses awarded do *not* need to bear a direct causal connection to particular acts of falsification. Rather, as the Supreme Court recognized in *Chambers*, once a party sets out on a course of bad faith litigation, it taints the entire litigation, and the court may vindicate itself by requiring the bad faith litigator to pay *all* of its opponent's attorney fees and expenses.[15] A court also may impose additional monetary sanctions—in the form of fines or punitive damages—above and beyond the specific amount of the innocent party's fees and expenses.[16]

*Seek an Adverse Inference Instruction or Issue Preclusion*
Where falsification takes the form of intentional destruction or alteration of evidence—an act often termed "spoliation" of evidence—then a court may decide to punish the wrongdoer and pro-

"Responding to Falsification of Evidence" by Jonathan K. Tycko, published in Committee on Corporate Counsel Newsletter, Volume 20, No.2, Winter 2006 © 2006 by the American Bar Association. Reproduced by permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

vide a remedy for the opposing party by altering the way in which the trial will be conducted. Two common methods are adverse inference instructions and issue preclusion.

An adverse inference instruction is an instruction to the jury that it may infer something specific about the wrongdoer's claims or defenses as a result of the spoliation. For example, if a doctor-defendant in a medical malpractice action is found to have intentionally discarded portions of the patient-plaintiff's medical records, a court might instruct the jury that it is permitted to infer that the records would have contained evidence of malpractice. The adverse inference instruction merely tells the jury that it is permitted to make a particular factual inference. While this may seem a relatively mild sanction for spoliation, it actually is fairly powerful medicine because the instruction "directs the jury's attention to the inference the court instructs on and can give the impression that the court thinks the jury ought to draw the inference."[17]

Generally, a party seeking an adverse inference instruction must show some degree of culpability on the part of the spoliator. Some courts have ruled that only intentional spoliation warrants an adverse inference instruction.[18] Others have held that gross negligence or recklessness is sufficient if the spoliated evidence would otherwise have been sufficiently important to the case.[19]

Issue preclusion is a somewhat stronger remedy. Issue preclusion typically takes the form of a pretrial ruling precluding the wrongdoer from pursuing a particular claim or defense (or some particular element of a claim or defense) or of a ruling designating particular facts that will be taken as established for purposes of the action. So, for example, if the plaintiff in a medical malpractice suit is found to have intentionally destroyed a personal diary that the plaintiff kept in the period following the alleged malpractice, the court might preclude the plaintiff from pursuing claims for emotional distress damages but still permit the plaintiff to pursue claims for medical expenses. Issue preclusion is a type of sanction specifically contemplated by Rule 37 of the Federal Rules of Civil

Procedure; therefore, where the falsification also amounts to a violation of a party's discovery obligations, this rule (or equivalent state court rules) permits issue preclusion. Courts also have recognized that the sanction of issue preclusion can be imposed as an exercise of inherent power, making that sanction available even where the falsification does not fall within the scope of Rule 37.[20]

*Seek Judgment of Criminal Contempt*
In many jurisdictions, a trial court has the authority to summarily punish perjury through a criminal contempt proceeding against the lying witness. In federal courts, false or evasive testimony can constitute criminal contempt under 18 U.S.C. § 401. But the power to punish perjury by way of contempt proceedings is a very limited one. As the U.S. Supreme Court recognized in the 1919 case of *Ex parte Hudgings*, not all perjury is contempt of court.

> [I]t would follow that when a court entertained the opinion that a witness was testifying untruthfully the power would result to impose a punishment for contempt with the object or purpose of exacting from the witness a character of testimony which the court would deem to be truthful; and thus it would come to pass that a potentiality of oppression and wrong would result and the freedom of the citizen when called as a witness in a court would be gravely imperiled.[21]

Thus, to constitute criminal contempt, perjury must also be "[a]n obstruction to the performance of judicial duty resulting from an act done in the presence of the court."[22]

One of the most difficult barriers to obtaining a judgment of contempt is the requirement that, to hold a party or witness in contempt, the court must have what is described in the cases as judicial knowledge of the perjury. This is a very high standard that appears to require the court to know—in an almost metaphysical sense—that it has just witnessed false testimony. Thus, many cases have held that where the court must weigh conflicting testimony or evidence in order to determine if the witness has committed perjury, then the court cannot punish that

perjury by way of a contempt proceeding. Rather, as one court recently put it, the perjury must be "apparent without reference to extrinsic evidence in the record."[23] For example, if a witness were asked for his or her whereabouts on a particular night, to answer "on Venus" would be contempt, whereas "in California" might not be, even if the witness had been photographed in New York on the night in question.[24] The judge knows the witness was not on Venus without reference to any other evidence. But, without resort to the extrinsic evidence of the photograph, the judge does not know that the witness was not in California.

Because of this judicial knowledge requirement, seeking a judgment of contempt is a step that is likely to succeed in only a fairly limited class of cases. Generally, it will not be enough that you can *demonstrate* that the witness has lied under oath. Rather, the testimony of the witness must be intended to obstruct the court's proceedings, and this must be apparent from the testimony itself.

*Seek Relief from Prior Judgment*
Where an opposing party's falsification comes to light after a final judgment or order, the falsification may provide a basis for reopening the case. In the federal courts, and in states with similar rules, the usual procedure is to file a motion for relief from judgment. Rule 60(b) of the Federal Rules of Civil Procedure explicitly recognizes that fraud, misrepresentation, or "other misconduct of an adverse party" may provide a basis for relief from a prior judgment or order.

*Assert Claim for Tort of Spoliation*
The tort of spoliation has been described as "intentional interference with prospective or actual civil litigation."[25] Although

3 • Committee on Corporate Counsel Newsletter • American Bar Association • Winter 2006 • Volume 20 • Number 2
"Responding to Falsification of Evidences" by Jonathan K. Tycko, published in Committee on Corporate Counsel Newsletter, Volume 20, No.2, Winter 2006 © 2006 by the American Bar Association. Reproduced by permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

altered evidence with the specific "purpose of depriving an opposing party of its use."[28] Claims for spoliation can lie, in some jurisdictions, against both "first-party" defendants (namely, parties to the underlying civil litigation) and "third-party" defendants (namely, those who are *not* parties to the underlying civil litigation).[29] A party asserting a tort claim for spoliation must meet other elements typical to tort claims, such as causation and damages. Accordingly, whether pursuit of a tort claim for spoliation is advisable may depend both upon the state of local law in the relevant jurisdiction and also upon whether causation and damages can be proven.

*Assert Other Common Law Claims*
Falsification can expose the wrongdoer to a claim for malicious prosecution. A claim for malicious prosecution lies only where the malicious prosecution plaintiff establishes that a prior action terminated in his or her favor and that the defendant brought the prior action without probable cause and with malicious intent.[30] A party has "probable cause" to initiate a civil lawsuit if, among other things, that party has a reasonable belief in the existence of the facts that warrant the lawsuit.[31] Thus, if it could be shown that the defendant instituted the prior action with knowledge that his or her claims could only be supported with fabricated evidence, then this would tend to show a lack of probable cause and would also be evidence in support of the malice element. In addition, courts have recognized that the favorable termination element of a malicious prosecution claim can be satisfied—even where the malicious prosecution plaintiff lost the prior case—where "the original judgment was obtained through fraud."[32] Thus, where the evidence of falsification comes to light after the falsifying party has already won the prior lawsuit, a malicious prosecution action may still be viable.

In some unusual circumstances—where one party is forced to give up a claim because of another party's falsification—fraud or other related deception-based claims also may be available. An example is *Morgan v. Graham*.[33]

Graham was injured in an automobile accident and obtained a default judgment against the negligent driver, Godfrey W. Cochran. Graham learned that an insurance adjuster for the (as it turned out) inaptly-named Moral Insurance Company had investigated the accident. So Graham brought an action against that insurer on the theory that the insurer had issued a liability policy to Godfrey W. Cochran and that the insurer should pay proceeds of that policy to Graham to satisfy the default judgment. In response, Moral submitted an answer, verified by its president,

> If you catch the other side engaged in falsification, you can use it to argue that its entire position lacks merit.

Max T. Morgan, stating that there was no such policy in its files. Faced with that verified answer—and with no direct evidence to rebut it—Graham voluntarily dismissed the case.

Moral subsequently went into receivership. Graham then brought an action against Morgan, the president. In that action, Graham alleged that Moral had indeed issued a policy to a "G. W. Cockran," that this person and Godfrey W. Cochran were the same person, and that Morgan knew this when he signed the verified answer in the prior action against Moral. Graham's case against Morgan went to trial on a claim of fraud, and evidence was presented that Morgan knew that "G. W. Cockran" and Godfrey W. Cochran were the same person. The trial court found for Graham and awarded both compensatory and punitive damages.

On appeal, the Tenth Circuit affirmed. The court noted that the victim of perjury normally does not have a cause of action against the person who

committed the perjury.[34] But the court reasoned that perjury can provide a predicate for other tort claims if the elements of those torts can otherwise be proven.[35] The court then considered whether Graham had proved reliance upon Morgan's false statements. Although Graham testified that he did not believe Morgan's statements in the earlier case, the court reasoned that Graham "was nonetheless forced to act to his detriment and do what he would not have done had the statement not been made," and thereby "was forced to rely on the misrepresentations."[36] The court upheld both the compensatory and punitive damages.

*Use the Other Side's Falsification to Undermine Its Position*
The last potential response I will address is also the most common and can often be the most powerful. If a lawyer believes that it is possible to catch the other side in a lie, the lawyer can simply do just that, and thereby destroy the other side's credibility. An oft-quoted passage from one of the leading evidence treatises explains:

> It has always been understood—the inference, indeed, is one of the simplest in human experience—that a party's falsehood or other fraud in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. The inference thus does not necessarily apply to any specific fact in the cause, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting his cause.[37]

In other words, if you catch the other side engaged in falsification, you can use that catch to argue that the other side's entire position lacks merit. And even more fundamentally, judges and juries do not like being tricked. If a judge or jury agrees that your opponent has engaged in falsification—even falsification relating only to one of several issues in the case—it will hold this

"Responding to Falsification of Evidences" by Jonathan K. Tycko, published in Committee on Corporate Counsel Newsletter, Volume 20, No.2, Winter 2006 © 2006 by the American Bar Association. Reproduced by permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

quite strongly against your opponent and will come to doubt the validity of everything your opponent says and claims.

## Conclusion

Falsification is a serious and common problem in civil litigation. The courts have developed numerous responses to falsification, including various types of sanctions that can be imposed in the

> Responding vigorously to falsification helps to preserve the integrity and fairness of the judicial system as a whole.

case in which the falsification occurs and various potential claims that can arise out of falsification. When faced with falsification by an opposing party, a lawyer should consider all of these various responses. Responding vigorously to falsification not only serves your client's interests in the particular dispute but also serves to deter falsification in other cases, and helps to preserve the integrity and fairness of the judicial system as a whole.

*Jonathan K. Tycko is a partner with Tycko Zavareei & Spiva LLP in Washington, D.C. He can be reached at (202) 973-0900 or by email at jtycko@tzslaw.com.*

### Endnotes

1. Thus, this article does not address the related, but distinct, topic of unintentional—but still potentially culpable—destruction or loss of documents. That topic, and the related issue of preventive document retention policies, has been the subject of many articles. Replowing of that ground will be avoided here.

2. Various specific types of falsification violate federal criminal laws. *See, e.g.*, 18 U.S.C. § 1621 (perjury punishable by up to five years' imprisonment); 18 U.S.C. § 1519 (knowing falsification or destruction of documents or other tangible objects punishable

by up to 20 years' imprisonment); 18 U.S.C. § 1520 (destruction of certain corporate audit records punishable by up to 10 years of imprisonment). And knowing destruction or falsification of documents in an attempt to influence the outcome of a judicial proceeding also violates the general "obstruction of justice" law. 18 U.S.C. § 1503. *See, e.g.*, U.S. v. Craft, 105 F.3d 1123, 1128 (6th Cir.1997) ("Acts that distort the evidence to be presented or otherwise impede the administration of justice are violations of 18 U.S.C. § 1503. The act of altering or fabricating documents used or to be used in a judicial proceeding would fall within the obstruction of justice statute if the intent is to deceive the court."). All states have similar laws.

3. USSG, § 2J1.2.

4. Breezevale Ltd. v. Dickinson, 759 A.2d 627, 641 (D.C. 2000) (Schwelb, J., concurring).

5. Mark Curriden, *The Lies Have It*, ABA J., May 1995, at 69.

6. 322 U.S. 238, 246 (1944).

7. 501 U.S. 32, 44 (1991).

8. Some examples are: Breezevale v. Dickinson, 879 A.2d 957, 964 (D.C. 2005) (affirming sanction of dismissal where top executives of plaintiff company engaged in scheme to forge documents and subsequently denied the forgery in pleadings and sworn testimony); Synanon Found., Inc. v. Bernstein, 503 A.2d 1254, 1263 (D.C. 1986) (affirming sanction of dismissal where plaintiff, inter alia, destroyed audiotapes and made false statements to the court "that no responsive documents could be found" in order "to deceive the court, and to improperly influence the court in its decision on the defendants' motions to compel, with the ultimate aim of preventing the judicial process from operating in an impartial fashion"); Cox v. Burke, 706 So. 2d 43 (Fla. Dist. Ct. App. 1998) (affirming sanction of dismissal where plaintiff gave false answers to interrogatories and deceptive deposition testimony); Pope v. Fed. Express Corp., 974 F.2d 982, 984 (8th Cir. 1992) (affirming sanction of dismissal for plaintiff's forgery of, and reliance on, a single document); Aoude v. Mobil Oil Corp., 892 F.2d 1115 (1st Cir. 1989) (affirming dismissal where plaintiff concocted a single document); Tramel v. Bass, 672 So. 2d 78, 82 (Fla. Dist. Ct. App. 1996) (affirming default judgment against defendant who excised damaging six-second portion of videotape before producing it during discovery).

9. Shepherd v. Am. Broad. Cos., 62 F.3d 1469, 1478 (D.C. Cir. 1995) (quoting Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118 (1st Cir. 1989)).

10. *See, e.g.*, Nichols v. Klein Tools, Inc., 949 F.2d 1047, 1048 (8th Cir. 1991).

11. *See, e.g.*, Breezevale Ltd v. Dickinson, 879 A.2d 957, 964 (D.C. 2005); Paladin Assocs., Inc. v. Montana Power Co., 328

F.3d 1145, 1164–65 (9th Cir. 2003).

12. 200 F.3d 465, 466 (7th Cir. 1999).

13. Wyle v. R.J. Reynolds Indus., Inc., 709 F.2d 585, 589 (9th Cir. 1983).

14. *See, e.g.*, Jimenez v. Madison Area Technical Coll., 321 F.3d 652 (7th Cir. 2003).

15. 501 U.S. at 56–57; *see also* Synanon Found., Inc. v. Bernstein, 517 A.2d 28, 43 (D.C. 1986) (once a party embarks on a "pattern of fraud," and "[r]egardless of the relevance of these [fraudulent] materials to the substantive legal issue in the case," this is enough to "completely taint [the party's] entire litigation strategy from the date on which the abuse actually began").

16. Jemison v. Nat'l Baptist Convention, 720 A.2d 275, 285 (D.C. 1998) (punitive damages may be imposed if court finds that bad faith litigator acted with malice).

17. Klezmer v. Buynak, 227 F.R.D. 43, 52 (E.D.N.Y. 2005).

18. *See, e.g.*, Stevenson v. Union Pac. R.R. Co., 354 F.3d 739, 746–47 (8th Cir. 2004).

19. *See, e.g.*, Reilly v. NatWest Markets Group Inc., 181 F.3d 253, 267–68 (2d Cir. 1999).

20. *See, e.g.*, Monsanto Co. v. Ralph, 382 F.2d 1374, 1382 (Fed. Cir. 2004).

21. 249 U.S. 378, 384 (1919).

22. *Id.*; *see also In re* Michael, 326 U.S. 224, 227–28 (1945).

23. U.S. v. Arredondo, 349 F.3d 310, 320 (6th Cir. 2003); *see also* D.V. v. State, 817 So. 2d 1098, 1099 (Fla. Ct. App. 2002) (discussing "judicial knowledge").

24. For discussion of "on Venus," *see* U.S. v. Arredondo, 349 F.3d 310, 320 at 319 n.9 (6th Cir. 2003).

25. J.S. Sweet Co. v. Sika Chem. Corp., 400 F.3d 1028, 1032 (7th Cir. 2005) (applying Indiana law).

26. *See* Gribben v. Wal-Mart Stores, Inc., 824 N.E.2d 349, 353 (Ind. 2005), for a recent listing of cases from different states that have either adopted or rejected an independent tort of spoliation.

27. *Id.*; *see also* Hannah v. Heeter, 584 S.E.2d 560, 568 (W. Va. 2003); Holmes v. Amerex Rent-A-Car, 710 A.2d 846, 854 (D.C. 1998).

28. Burge v. St. Tammany Parish, 336 F.3d 363, 374 (5th Cir. 2003) (discussion of Louisiana law).

29. *See, e.g.*, Smith v. Howard Johnson Co., 615 N.E.2d 1037, 1038 (Ohio 1993).

30. *See generally* 52 AM. JUR. 2d, "Malicious Prosecution."

31. *See, e.g.*, Norse Sys. v. Tingley Sys., 715 A.2d 807, 815–16 (Conn. App. 1998).

32. Tyler v. Central Charge Serv., Inc., 33. 228 F.2d 625 (10th Cir. 1956).

34. *Id.* at 627.

35. *Id.*

36. *Id.* at 628.

37. 2 J. WIGMORE, EVIDENCES § 278, at 133 (Chadbourn ed. 1979).

5 • Committee on Corporate Counsel Newsletter • American Bar Association • Winter 2006 • Volume 20 • Number 2
"Responding to Falsification of Evidences" by Jonathan K. Tycko, published in Committee on Corporate Counsel Newsletter, Volume 20, No.2, Winter 2006 © 2006 by the American Bar Association. Reproduced by permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

# Exhibit 1

USWGO
QANON // DRAIN THE SWAMP
MAKE AMERICA GREAT AGAIN



UNITED STATES DISTRICT COURT CASE NO. 1:13-CR-435-1
MIDDLE DISTRICT OF NORTH CAROLINA

Exhibit in attachment to "MOTION FOR SANCTIONS AND TO VACATE
JUDGMENT IN PLAINTIFF'S/RESPONDENT'S FAVOR -- MOTION AND BRIEF /
MEMORANDUM OF LAW IN SUPPORT OF REQUESTING THE HONORABLE
COURT IN THIS CASE VACATE FRAUDULENT BEGOTTEN JUDGMENT OR
JUDGMENTS"



Autism Spectrum Disorders

## About this booklet

Do you know someone who has an autism spectrum disorder? Chances are, you do. Responding to many requests from Missourians for information about autism, this booklet reflects a careful review of the latest autism research, and provides resources.

## Acknowledgements

Geoff Lanham's "Preface" appeared in *The GUIDE* (March 2004) as "When the Diagnosis Doesn't Fit: A father finds help for his son."

Thanks to autism consultant Julie Donnelly, Ph.D., for advice, resources and access to her work.

"Case Studies" by Julie Donnelly originally appeared in the Fall, 2004 issue of *Autism Spectrum Quarterly* as "A Spectrum of Individuals—A Spectrum of Services," and is reprinted here by permission of Starfish Specialty Press, LLC.

Thanks to Sandra Dailey of Project LIFE, for careful editing, and to Patricia Alonzo, speech pathologist, Warrenton Mo. School District.

**Cover photo** © Camela S.D. Littlepage.  Design by Kristen Heitkamp.

The **Missouri Department of Mental Health** provided funding for this booklet. The department's mission is to improve the lives of Missourians in the areas of mental illness, substance addiction and developmental disabilities.

**Project LIFE** (Leisure Is For Everyone) is a cooperative program supported by the Missouri Department of Mental Health and the University of Missouri, whose mission is to increase public awareness of mental health issues through education and training, and to advocate for the quality of life of persons with brain disorders.

—*Kristen Heitkamp, Editor*
*April, 2005*

*All rights reserved. This booklet is not intended to give medical or psychiatric advice. Address inquiries to the Editor at Project LIFE, 620 Clark Hall, University of Missouri, Columbia, MO 65211 or call the toll free LIFE Line at 1-800-392-7348.*

# Contents

Preface ............................................................................................... 4
Introduction ........................................................................................ 6
What is Autism? ................................................................................. 6
Prevalence .......................................................................................... 7
What causes autism? ........................................................................... 7
Sensorimotor Symptoms ...................................................................... 8
Auditory Deficits ................................................................................ 8
CAPD .................................................................................................. 8
Speech and Language Deficits .............................................................. 7
Visual Deficits .................................................................................... 9
Hypersensitivity to Smell ................................................................... 9
Food Allergies .................................................................................... 9
Touch and Tactile Sensitivity ............................................................ 10
Assessment ........................................................................................ 11
Red Flags ........................................................................................... 11
Assessment/Diagnosis ........................................................................ 11
Interventions ...................................................................................... 12
Behavioral Interventions .................................................................... 12
Complementary Therapies .................................................................. 14
Medications ........................................................................................ 16
Dietary and Biomedical Treatments .................................................... 16
Educational Interventions ................................................................... 17
Case Studies ....................................................................................... 18
Psychiatric Diagnoses ........................................................................ 22
Autistic Disorder (classical autism, Kanner's syndrome) ..................... 23
Childhood Disintegrative Disorder (Heller's Disorder) ....................... 23
Asperger syndrome ............................................................................. 24
High-functioning Autism .................................................................... 24
Pervasive Developmental Disorder - Not Otherwise Specified ............. 25
Rett syndrome .................................................................................... 26
Neurological Disorders ....................................................................... 27
Attention Deficit/Hyperactivity Disorders .......................................... 27
Depression .......................................................................................... 27
Obsessive-Compulsive Disorder .......................................................... 28
Schizophrenia ..................................................................................... 28
Tourette syndrome .............................................................................. 28
Glossary .............................................................................................. 29
Bibliography ....................................................................................... 33
Resources ............................................................................................ 35

3

# Preface

## by Geoff Lanham, Project LIFE Coordinator

The diagnosis didn't match the behavior.

For a long time, I knew in my head and in my heart that there was something different about my youngest son, Grant. While the symptoms of ADHD were present, there were other behaviors that often alarmed me.

Grant started reading at the age of three. He was fascinated with dinosaurs and could tell you all about the diplodocus and triceratops. Grant often asked me for definitions of words that I had to look up in the dictionary. He was able to compute math problems that most six-year-old children couldn't touch. Grant's teachers complimented him on his intelligence.

His conduct at home wasn't really worrisome. Grant never got into much trouble. Although he always needed prompting to eat or to bathe, or to do common household chores, he wasn't much different than my other children? Then why was there a problem?

At first I thought it was the divorce and new home—changes that would account for any six-year-old child's behavioral problems. We also changed Grant's ADHD medication—that in itself was a living hell. When the dust settled from the divorce and the move, however, he was still acting out at school. On occasion, Grant had trouble with adults, but most of the aggression was directed at his classmates. This behavior was unacceptable—to me and to his teachers.

When Grant was suspended from school for a lunchroom incident, I had the opportunity to discuss his problems with the vice-principal. After a long talk, we agreed that he needed further psychological testing. She recommended referral to the public school autism specialist. Once again, we faced the arduous task of filling out paperwork. Both his mother and I answered questionnaires. For over two hours, we both were questioned by the autism specialist. His teachers were questioned. No stone was left unturned.

Finally the day arrived. We found out why Grant behaved the way he did: he was diagnosed with Asperger syndrome (AS). Having read about this disorder (when my nephew was diagnosed with autism), I recognized many of the characteristics in my son. Back then, I hated to put another label on Grant, and discarded the notion that he might have autism. Now I know better.

4

Although Grant has another label attached to his resume, this one has been a relief. With insight into Asperger syndrome, we can help my son by anticipating problematic situations. Grant's troubles seemed to happen in very noisy circumstances (in the gym or during recess), places where the decibel level makes the hardest of hearing plug their ears. The lunchroom was always difficult. Not only was noise bothersome, but certain smells also set him off. Grant would push or shove or throw things at fellow students. When I asked him why he did these things, Grant just said, "I don't know Dad, I really don't know."

Now I know, and it's getting easier to adapt his environment or to anticipate a challenge. For instance, children with AS are very sensitive to sound. Grant will cover his ears and get in the fetal position if a fire engine is within a couple of blocks—even when I can barely hear the fire engine. I cannot run the vacuum cleaner when Grant is in the house, because he acts as if someone is running fingers on a chalkboard, and he screams as if in pain.

Certain smells set him off: garlic, for instance. Grant eats only particular foods. I've learned to choose my battles, and as long as Grant is eating, it's better than fixing a meal that will sit on the dinner table, get cold and end up in the garbage.

I play a game with him called "let's see who can stare the other down the longest." Children with AS have a difficult time maintaining eye contact; their eyes wander back and forth. With a lot of effort—the "stare down" game—we are making progress.

Children with AS often take things literally. If you say it is "raining cats and dogs", don't be surprised if a child looks at you in a puzzled manner. To him, it is just raining; there are no cats and dogs falling from the sky!

At school, we've adapted Grant's routine. For instance, he has lunch in the assistant principal's office. He has one recess instead of two. He is given advance warning of a fire drill. These simple steps improve Grant's ability to get along with his peers.

As parents, we need to follow our instincts. We know what makes our children tick. I know that my son will struggle in the classroom. I know that he will shine, as well. Grant has been fortunate. His teachers perceived his strengths, and always encouraged him to be the best student possible. They knew in their hearts and minds that something was different about him. Together, we finally figured it out.

5

# Introduction

> *Imagine, if you will, waking up one day. Your bed, your arms on the sheet, the book on the table, are seen in fragments. You try to focus but cannot. Lights flash off and on. Everything in the room seems to have a hard edge, without shades of gray, as if you woke up inside of a video game.*
>
> *And the noise! BOOM boom BOOM boom BOOM boom. It could be the beating of your heart, footsteps in the hall—you have no idea.*
>
> *Your arms feel asleep. You raise a hand and consider it, shaking it once to see what it will do. Lying back on the pillow, you hear another sound and freeze in fear. Something is touching you, a figure with darting eyes, making unrecognizable sounds. The figure grabs your hand—you scream, close your eyes and cover your ears, willing it to go away.*
>
> *Imagine waking up with autism.*

## What is Autism?

**NOTE:**
In most cases, the words "autism" and "autism spectrum disorder" are used interchangeably.

"As a parent, what is not important is the label, but how I can help my child."
— Betty Kramer, RN

Autism, or autism spectrum disorders (ASD), comprise a variety of developmental disorders related to

- communication
- developmental delays, or uneven development
- sensorimotor functions, and
- social interaction

Autism represents a wide range of cognitive and physical abilities, which vary considerably among diagnoses and individuals—thus the designation as a "spectrum." Because of this variability, diagnosis of autism is confusing. For instance, a person, who has a normal to high IQ and the ability to communicate, may be diagnosed with either Asperger syndrome, Asperger Disorder or High Functioning Autism. All of these labels describe the same set of symptoms.

Autism spectrum disorders involve biological systems: the brain, the immune system, the sensory/nervous systems and the gastrointestinal system.

Individuals with autism may have other (co-occurring) disorders such as seizures, allergies, gastrointestinal disorders, sensory disorders, hyperactivity, and anxiety or mood disorders.

6

## Prevalence

The reported prevalence of autism varies—the National Alliance for Autism Research estimates one in every 250 births, while recent studies place the prevalence as high as one in every 166 children.

Some scientists caution that the apparent rise in autism spectrum disorders may be due to increased awareness and diagnosis of these disorders.

Reviewing an epidemiological database in Olmstead County, Minn., Mayo Clinic researchers found that the incidence of reported cases of autism was stable prior to 1988. When diagnostic criteria for autism expanded in 1987, and new federal special education laws included autism as a disability category, the rate of reported autism increased.

Authors of the study theorize that, prior to these changes, children with autism may have been diagnosed with "developmental delay" or "mental retardation," while children with milder symptoms of autism may not have been identified at all.

## What causes autism?

Researchers have identified a genetic predisposition to autism spectrum disorders, which "interacts with an as-yet-unknown environmental factor or factors and causes alterations to the immune system, the sensory nervous system, the brain and often the gastrointestinal tract as well." (Cure Autism Now)

Recent research at Johns Hopkins School of Medicine suggests that autism may be related to brain inflammation, and further, the brain's immune system may be triggered by factors "possibly including birth complications, diet, toxins or infections." Researcher Carlos Pardo summarized: "These findings reinforce the theory that immune activation in the brain is involved in autism, although it is not yet clear whether it is destructive or beneficial, or both, to the developing brain." (*Annals of Neurology* 57, 1 (2004)) A BBC report on this study adds that "another [study] found raised levels of nitric oxide in the plasma of children with autism. This chemical plays a role in the immune response, and is known to affect neurodevelopmental processes." (Nov. 15, 2004)

While both genetic and environmental factors are responsible for autism, there is no single cause. Theories that vaccines cause autism are unproven. (See related information on p. 21.)

**REFERENCE**
William Barbaresi, et. al. in *Archives of Pediatrics and Adolescent Medicine* (1/05), on-line at: http://www.mayoclinic.org/news2005-rst/2551.html

Researchers say autism spectrum disorders are a result of a combination of perhaps 10 to 20 genes, plus environmental factors, that seem to cause the brain to exhibit less activity in its social and emotional centers. *(New York Times)*

7

# Sensorimotor Symptoms

## Auditory Deficits

Individuals with autism often have difficulty processing auditory information. Some individuals may be overstimulated because they are unable to discriminate between sounds, or they are unable to filter out background noise. Some individuals are highly sensitive to different sound frequencies, while others may be sensitive to loud noise.

## CAPD

Some individuals exhibit symptoms of central auditory processing disorder (CAPD), a hearing impairment located in the brain (where incoming speech is "processed" and understood) rather than in the ear.

**REFERENCE**
Stephen M. Edelson, Ph.D.,
"Auditory Processing
Problems in Autism."
Center for the Study of
Autism. (Salem, Oregon)

### Internal symptoms of CAPD:
• difficulty discriminating foreground from background noise
• distortions of incoming speech
• delay or "lag time" in processing speech

### External symptoms of CAPD:
• asking for repetition ("huh?" "what?")
• echolalia
• articulation difficulties
• responding incorrectly to spoken directions (for instance, processing "incomplete sentences" for "*in* complete sentences")
• apparently "ignoring" people
• interrupting or "speaking over" people
• delayed response to speech
                 (from http://www.autistics.org/library/capd.html)

## Speech and Language Deficits

Some individuals with autism hear the spoken word as a meaning-less sound. As Temple Grandin writes, they do not perceive language as a way of communicating. Many of these individuals, who may be visually oriented, learn to talk when the sound is associated with a picture or the written word. Some people communicate through sing-ing, and singing may become a "bridge" to the spoken word. Often children will echo what they hear (echolalia) or have heard (delayed echolalia). (Grandin, *Thinking in Pictures*)

8

### Speech and language deficits, continued.

Testing by an audiologist can determine how well a person can hear a range of frequencies in each ear. From there, speech and language therapy, designed for individual needs, is essential. A certified speech pathologist can assess and design specific interventions to improve language comprehension and skills.

## Visual Deficits

Many people with autism report visual perceptual problems, such as tunnel vision, reliance on peripheral vision, or difficulty in telling foreground from background. Other problems may include:

- sensitivity to light frequencies, typically to fluorescent light which flickers and emits a high buzzing sound;
- inability to focus on constantly changing visual stimulation, such as another person's eyes;
- visual "overload" producing sensations such as strobing, white light;
- difficulty with multisensory processing: inability to look at someone and listen to them at the same time.

An optometrist can rule out other problems with a visual exam.

Some of the areas in which individuals have visual differences may also provide their strengths—seeing differently can be an asset to an artist, for instance.

## Hypersensitivity to Smell

Because of hypersensitivity to smell, some children with autism may refuse to eat certain foods, go to a zoo, sit in the school cafeteria, or visit a farm. Household chemicals, laundry detergent, perfume, cigarette smoke or cooking odors may trigger sensitivities.

## Food Allergies

The rate of both food allergies and food sensitivities among people with ASD appears to be higher than the 5% norm. Common causes of food allergy are milk, eggs, peanuts, soy, nuts, fish and shellfish. Food allergies are confirmed by a skin-prick or blood test. Besides allergy testing, a child may be tested for vitamin or metabolic deficiencies with a urine test. (See "Dietary and Biomedical Treatments," page 15.)

## Touch and Tactile Sensitivity

One of the early signs of autism is observed in babies who scream when they are touched or hugged. Some people with autism report that light touch can be painful, or may incite feelings of anxiety. (For instance, imagine when your leg has "gone to sleep" and you feel "pins and needles.")

REFERENCE
Luke Jackson, *Freaks, Geeks and Asperger Syndrome: A User Guide to Adolescence.* (2002) Jessica Kingsley Publishers: London.

Luke Jackson writes that clothing can feel especially torturous, especially clothing labels, new jeans, scratchy fabric or wool socks. Well-washed, soft, natural fabrics such as cotton and silk are preferable.

Others report that they have little or no sense of their bodies; some do not feel "in" their bodies, or perceive an arm or leg as a part of their body. Some self-stimulating behaviors are related to these feelings: hand flapping or wringing, twirling or rocking.

For many people with autism, a light level of tactile stimulation is painful; they actually crave *deep* pressure (received by bumping into walls, or rolling, or hitting their arms or leg).

### A typical day ...

Educational Consultant Alex Michaels, who has Asperger syndrome, describes a typical school day:

> All of a sudden my ears felt as if someone was taking a rototiller and cutting up my eardrums—the lunch bell rang. Next, I needed to claw my way into the jungle of smells where my classmates corralled around the coat hooks grabbing their lunch bags ... as I descended into the cafeteria of despair, I would do battle on the stairs as the sour smell of linoleum lined my nostrils...As if that wasn't bad enough, this overstimulating environment only led to the torture chamber (AKA: playground) where each day I was reminded of just how much I didn't fit in.

10

# Assessment

## Red Flags

"Red flags" may indicate a child is at risk for developmental disorders, and should have an **immediate** evaluation. If your child shows any of the following signs, don't hesitate to call your doctor:

- No big smiles or other warm, joyful expressions by **6 months** or thereafter
- No back-and-forth sharing of sounds, smiles, or other facial expressions by **9 months** or thereafter
- No babbling by **12 months**
- No back-and-forth gestures, such as pointing, showing, reaching or waving by **12 months**
- No words by **16 months**
- No pretend play by **18 months**
- No two-word meaningful phrases (without imitating or repeating) by **24 months**
- **At any age**, ANY loss of speech or babbling, or of motor skills
- **Acute** sensitivity to touch, taste, noise or smells
- Repetitive behaviors like hand wringing, head banging, twirling
- Odd use of the eyes

## Assessment/Diagnosis

An assessment of autism is based on observation of a child in various settings: the home, school and clinic or doctor's office. The diagnostic evaluation of autism will often include a complete physical and neurologic examination and use of specific diagnostic instruments such as the Childhood Autism Rating Scale (CARS); and Autism Diagnostic Observation Schedule (ADOS).

It is important that the interview include an in-depth social history with the parents or caregivers, and with others who know the child well. The interview may include assessment using one or more rating scales. The ADOS, a structured interaction with the child, is considered the gold standard in autism diagnosis.

For high functioning individuals, instruments specific to this population are the Asperger Syndrome Diagnostic Scale and the Gilliam Asperger Diagnostic Scale.

**REFERENCES**

Greenspan, S.I. (1999)
*Building Healthy Minds*,
Perseus Books: New York.

Filipek, P.A. et al. "Practice parameter: Screening and Diagnosis of autism."
*Neurology* 2000, 55: 468-79.

11

# Interventions

Typically, childhood development is an orderly process of acquiring and building upon skills. In ASD, however, the brain is unable to interpret sensory information, and to develop appropriate neurological responses. Therapy is designed as an intervention that retrains the brain's neurological functions.

Treatment plans are based on a child's symptoms and the level of neurological impairment, and are designed to address the individual's needs. A National Academy of Sciences report (2001) suggests at least 25 hours a week of intensive training, starting with a child as young as age two. Other researchers noted, "fragmented, weak efforts in early intervention are not likely to succeed, whereas intensive, high-quality, ecologically pervasive interventions can and do." (*American Psychologist*, 1998)

Therapy includes the following components:
• Speech and language therapy, in order to address language and communication delay
• Occupational therapy to improve sensory integration and motor skills
• Visual supports
• Social skills training
• Highly structured, one-to-one, and small-group education
Complementary therapies include hippotherapy, music therapy, and auditory intervention training, page 13. Educational interventions are discussed in "Case Studies," page 17.

## Behavioral Interventions

Behavioral techniques help children with autism develop communication and social skills. Three strategies define the interventions: behavioral management using rewards and consequences (a star chart, for instance); functional behavioral analysis, in which the motive for a particular behavior is assessed (Why does he have his hands over his ears? Is he hypersensitive to noise?); and positive behavioral support (such as social skills building).

Parents learn behavioral techniques in order to provide structure in the child's environment, provide consistent rewards, and set limits.

**Autism Toolbox**
Think of interventions as tools. You wouldn't have just one tool, would you? "If you only have a hammer, then everything looks like a nail."
— *Julie Donnelly*

Typically an intervention team includes parents, a trained consultant, speech pathologist, occupational therapist and special educators.

12

Various intervention programs are designed specifically to enhance communication and cognitive skills. No single method works for all children; analysis of the research shows that approximately half of the children improve with any type of intervention. Rarely do individuals "recover."

Any intervention strategy should be designed to accommodate the strengths, interests and needs of the individual. Specific intervention programs or techniques include:

- Applied behavior analysis such as discrete trial-based training (Lovaas-type). This type of intervention is based on helping a child with ASD react to stimuli from the environment. In discrete trial-based training, a child is prompted and rewarded for a correct response.

- "Developmental/Individual Difference Model" is based on an analysis of where in the normal sequence of development the individual child went off the track, and on crafting a strategy for getting development back on track. It is designed to accomodate individual needs within unique family and cultural patterns.

- Building on the "individual difference" model, Dr. Stanley Greenspan developed a concept called "Floor Time," in which the caregivers (generally the parents) join the child in his or her preferred activity (with the intent of developing this action into an interaction). The caregiver must be able to identify an opportunity to teach a particular skill (such as taking turns), and then repeat the "lesson" until the child has acquired the skill.

- "Social Story" technique is used to teach better understanding of the many social and behavior concepts and routines that are a part of human relationships. Often individuals with autism "misbehave" because they don't understand implicit or nonverbal social rules. Through a social story, written specifically for that child and that situation, the therapist or parent shares the social cues that the child misses. The story helps the child understand the expectations and feelings of others in the situation, and gives cues to help the child choose socially appropriate behaviors. Social Stories can be written for all levels of functioning, by using pictures and varying the level of the language.

RESOURCE
www.thegraycenter.org/
Social_Stories.htm

13

# Complementary Therapies

Often, children with autism learn a social skill or routine within a particular setting, but cannot apply the lessons to everyday life (generalize). Complementary therapies help children use classroom skills in the real world.

## Therapeutic Horseback Riding (Hippotherapy)

*Hippotherapy literally means "treatment with the help of the horse" from the Greek word, "hippos" meaning horse.*
— American Hippotherapy Association

Therapeutic riding (hippotherapy) promotes sensory integration, coordination, balance and communication. The physical benefits are based primarily on the movements of the horse, which helps to improve the rider's balance, coordination, strength and muscle tonea by gently mobilizing the rider's joints.

For those with ASD, horseback riding offers additional benefits, as one mother notes: "Things like listening skills, awareness of things around them, skills with animals, friendships they can't get in the schools, learning the days of the week so they know which day they ride, responsibility..." The many aspects of hippotherapy (riding, grooming, bonding with the horse) encourage effort, develop a positive attitude, and promote a sense of well-being and accomplishment.

**RESOURCE**
To find a therapeutic riding center near you, contact North American Riding for the Handicapped Association (NARHA) at 800-369-RIDE (7433) or on-line at www.narha.org

## Auditory Intervention Training Strategies

Why do some children with autism hold their hands over their ears? They are hypersensitive to sound, or they cannot filter out background noise. Temple Grandin writes that unexpected noise, such as a public address system in schools, can be so frightening that a child will refuse to return to the classroom.

In 1950, the French physician Alfred Tomatis noted that the brain responds to "sound overload" through a process of blocking a particular frequency, or by "shutting down." He developed an instrument ("Electronic ear") that modulates—or changes—sound that enters the ears. Other sound therapies bear similarities to this method, such as Berard Auditory Integration Training, or Samonas Sound Therapy. While these approaches may help some people, they have not been verified by research studies to help all.

14

## Music Therapy

Along with other learning strategies, music therapy can provide physical and emotional outlets:

*Music provides concrete, multisensory stimulation (auditory, visual, and tactile). The rhythmic component of music is very organizing for the sensory systems of individuals diagnosed with autism. As a result, auditory processing and other sensory-motor, perceptual/motor, gross and fine motor skills can be enhanced.*

—American Music Therapy Association

## Touch

People who have autism may be hypersensitive to light touch, but deep touch may feel good. As part of sensory integation therapy, the "Squeeze Machine" (invented by Temple Grandin) allows a person to apply constant, deep pressure to the body; Grandin reports that this is comforting and calming. Grandin also suggests using a "mummy" type bag to sleep in. Some kids like to have rubber bands or snug shirt cuffs.

## Recreation Therapy

Children who have autism spectrum disorders vary in their abilities and interests, but all have a need to relax and enjoy life. Acquiring leisure interests and skills is just as important as learning math or making a sandwich. Recreation therapists are trained to assess leisure interests and adapt recreation programs to the needs of the participants. Strategies may include direct instruction, peer mentors, and the selection of programs with an appropriate level of inclusion and support.

When you're exploring recreation opportunities for your child, the recreation staff should be able to

• offer suggestions for leisure interests;
• assess your child's ability to participate in a program; and
• adapt a program to the needs of your child.

The Americans with Disabilities Act (ADA) mandates that no child can be excluded from a community recreation program on the basis of disability. In the past, many recreation departments have adapted a "continuum of leisure options" (Schleien, et al.) ranging from "segregated" programs like "Special Olympics" to "integrated" (or mainstreamed) programs.

**RESOURCE**
National Center on Accessibility
(812) 856-4422 (voice)
(812) 856-4421 (tty)
(812) 856-4480 (fax)
nca@indiana.edu
website: www.ncaonline.org

15

# Medications

While there is no "medication" for autism, there are medications that address some symptoms: for hyperactivity, depression, seizures, obsessive compulsive symptoms, aggression or anxiety. Sometimes medications are prescribed that do not seem to be appropriate, but actually work. For instance, some individuals without seizures often respond well to seizure medications. Every child is different.

The doctor looks at the symptoms and then tries medication for particular symptoms. Since each drug works differently in each body, often you may have to adjust medication levels.

You must see a medical doctor to decide which medications are necessary.  It's important to find a physician who is experienced in prescribing medication for autism, and to maintain an ongoing relationship with the physician.  If a medication is not working, it's important to get in touch with your doctor, and get good advice on changing meds. Be prepared to try several different medications or drug combinations until you find what is right for your child. Finally, realize that your child's needs will change over time.

*—Julie Donnelly, Ph.D.*

## Dietary and Biomedical Treatments

The following treatments have been reported to alleviate some problem behaviors, and in many cases, help children feel much better. While the anecdotal reports and case studies are compelling, few controlled scientific studies have consistently replicated results.

• Gluten Free/Casein Free (GFCF) diets address allergies to gluten, (found in wheat, oats, rye and barley); and casein (from dairy products).

• An anti-yeast (fungal) diet addresses yeast intolerance.

• Mercury detoxification (chelation) may be recommended for those who have been exposed to high levels of mercury, or who are very sensitive to mercury.

• Dietary supplements such as Vitamin B6, magnesium and essential fatty acids may be helpful. Consult your physician before taking a supplement.

• Studies reported by the National Institute of Health indicate that the hormone secretin is no more effective than taking a placebo.

## REFERENCES
Cure Autism Now!
www.cureautismnow.org

Web site list of metabolic research studies:
www.panix.com/~donwiss/reichelt.html

Also see www.gfcfdiet.com/Explanationofdiet.htm

16

# Educational Interventions

Autism spectrum disorders are medical diagnoses. The public schools also evaluate students for "educational autism." While the educational and medical definitions are similar, the assessment procedures are different for each. To receive special education services, your child must go through the educational evaluation process.

## IDEA

The federal Individuals with Disabilities Education Act (IDEA) provides that every child with a disability under the age of 21 is entitled to a free, appropriate public education. IDEA mandates that all children should receive their education in the least restrictive environment. Although the law encourages placement in neighborhood schools and interaction with typical peers, the child's needs determine actual placement.

Depending on the child's age, an Individualized Family Service Plan (IFSP; for children under 3) or an Individualized Educational Program (IEP; for students 3-21) describes the special educational and related services specifically designed to meet the child's needs.

The student must be assessed and found eligible for services. This evaluation also provides information on current functioning, which is used to write the Individualized Education Plan (IEP).

Following the assessment, an IEP is developed. Members of the IEP team include the child's family and the child (especially after age 14); special education professionals; the Local Educational Authority (LEA)—the school principal, counselor or special ed administrator who has the authority to delegate resources; and a regular education teacher. The parents may invite their physician or personnel from other support agencies, but these are not required.

Parental rights under IDEA include:

- The right to be informed about any evaluation activities that will be conducted with their child;
- The right to attend the IEP meeting and have input into the formulation of the IEP;
- The right to contest an IEP recommended by their local district if they do not feel it meets their child's needs;
- The right to a hearing and to mediation to resolve such conflicts;
- As a last resort, the right to take the school district to court to resolve their differences.

**RESOURCE**
To learn more about IDEA and federal programs for special education, see the Office of Special Education Programs (OSEP) web site at www.ed.gov/about/offices/list/osers/osep/index.html

**Preschoolers**
Services for children under three are usually home-based, with professionals visiting periodically to evaluate progress, provide direct teaching, and recommend activities to parents. Children from age three to five may be served in special programs, or in typical preschools with supportive services.

17

# Case Studies

by Julie A. Donnelly, Ph.D.

**AS A PARENT**, I saw my son develop from a child with symptoms of classic autism to an adult with Asperger-type differences.

But nothing prepared me for the diversity of autism present in the public schools, where there is a range of desire and ability to communicate among individuals, and a variety of communication systems they may rely on. Sensory differences may cause these children to pull back from interaction, and to have unusual behaviors. Often their lives are complicated by co-occurring conditions. Add individual personalities, family experiences, education or therapy environments, and it comes as no surprise that these children are as different as snowflakes.

The following stories illustrate the range of educational needs for individuals on the autism spectrum.

**Co-occurring condition:** may include sensory deficits such as poor eyesight or hearing; medical conditions such as allergies; or psychiatric disorders such as ADHD.

———

**COREY** is a three-year-old with very limited communication skills. He signs the word *eat*, but uses it to mean many different things. Corey's play is best described as sensory-based. He likes to throw toys, run his hands through sand, and to "wave" items, in order to look at them out of the corner of his eyes. It is difficult to get Corey's attention and, when engaged, he remains focused for only a few seconds. Corey often runs off, and has to be watched closely. Some say he is "noncompliant," but since Corey does not understand much language, his lack of compliance is likely due to receptive language difficulty.

Corey is not yet toilet-trained, eats with his fingers, and can dress only with direction and assistance. While he seems comfortable in the company of familiar adults, Corey doesn't yet recognize individuals beyond his mother. He shows no awareness of peers.

Corey is enrolled in an intensive early-childhood special education program. Designed for his unique personality, the program helps Corey to feel comfortable and safe in the school setting, and to build relationships.

An integral part of Corey's team is the Occupational Therapist (OT) who works directly with Corey, and consults with his teachers. During short periods throughout the day, teachers work with Corey on a one-to-one basis. Some of these sessions are highly structured to help Corey recognize, imitate, and understand receptive language.

**"Receptive" language:** learning to listen and understand spoken language; skills focus on auditory memory, following directions, and concept development.

18

In therapy, a skill is taught in a structured setting and "generalized" for a social environment.

Other sessions are devoted to play time, where staff members follow Corey's lead, building interactive play routines with a variety of toys and materials. During play time, staff members work on generalizing the language and skills that Corey is learning in the more structured setting.

A speech-language therapist works one-on-one with Corey, teaching him to use the Picture Exchange Communication System (PECS). Corey has mastered the idea of the exchange (that when he hands someone a picture, he gets something he wants), but still has difficulty distinguishing one picture from another. Everyone working with Corey attempts to help him (and his mother) use the PECS system.

PECS (Picture Exchange Communication System): a way of communicating with visual symbols rather than words. The symbols or pictures may be drawn or pasted on index cards, or attached to a picture board.

Depending on his ability to cope, Cory joins his peers for "open circle." Currently he is sitting with the group for a short time during music—a preferred activity. Although Corey's supports are intensive, he is beginning to learn the routines of his school day, and to demonstrate slow but steady progress.

**AMY** exhibited problem behaviors in preschool. She refused to sit and listen to stories; she played alone with specific toys; when other students "got in her space," Amy often became aggressive.

Amy knew her ABCs and numbers better than other preschoolers, yet she refused to do work sheets or art projects. Sometimes Amy had meltdowns and screamed. Despite warnings from the preschool director, Amy's parents hoped she would grow out of her problem behaviors. Amy did not.

When Amy entered kindergarten, the school sought an evaluation. The diagnosis of an autism spectrum disorder shocked Amy's parents, but they agreed the characteristics fit their daughter.

Pragmatic skills: using both verbal and nonverbal language to give and receive information.

In kindergarten, a language therapist sees Amy individually (to build pragmatic skills), and also in a pair or small group setting (where Amy practices social language). At other times, the language therapist observes Amy in the classroom, and offers support by prompting generalization of new skills.

A thorough evaluation by an OT uncovered sensorimotor problems. The OT provides services in the classroom environment, where the teacher created a "quiet space" for Amy to use when she feels overwhelmed and needs to relax.

While Amy displays some skill in rote memory, she has difficulty understanding instructions and completing her work. A support person (aide) helps Amy with classroom tasks and projects, and also helps Amy learn to play with a wider variety of toys, and to interact with her peers.

19

**Expressive language:** skills include using a vocabulary, and the ability to narrate, or tell a story.

**MARY** is in a fourth-grade inclusive classroom setting, where (with guidance from classroom and special education teachers) a support person adapts the regular curriculum for her. Mary participates in many classroom activities. While Mary can speak, she needs therapy to increase her receptive, expressive and pragmatic language skills. Mary has always had friends, but since she is not as emotionally mature as her classmates, Mary is often confused by some of their complex friendship rituals.

Mary's parents know that their daughter will probably need continuing special education support. Mary may not be totally mainstreamed in secondary school, given the curricular challenges at that level. However, her parents hope that Mary will be able to find employment and live in the community with a moderate level of support.

**JOHN**'s parents were very nervous about their son's move to middle school. John had been quite successful in his elementary school setting, with some special education "pull out" and in-class services. While John communicates, he has a great deal of difficulty with social cues. In elementary school, everyone knew John—so when he said something unusual, students and teachers accepted it as part of who John is. His parents worried that students and teachers would not accept John in the middle school environment, and alerted his teachers that John might be bullied.

**An IEP (Individualized Education Plan)** is reviewed and adapted on a regular basis.

John also struggles with academics. While he often doesn't understand what the teachers are saying, he won't tell them so. This creates a vicious cycle, as they get upset when John doesn't turn in his work. Due to this concern, his IEP team decided that he should stay with his peers in most classes, but also spend two periods in a resource room. There, special education staff help John complete his work, and make sure that he understands the course concepts. John also is placed in a pragmatic language/social skills group.

**Federal law mandates that** students with disabilities will have a plan in place to aid in their transition from school to community.

**RON** spent all of his schooling in a special education "self-contained" classroom. He has basic communication skills, but cannot understand more complex language. Now 18 years old, Ron is in a "community skills" class, where he works in different community environments during the school year. The staff assesses the type of work Ron does best, and determines the amount of support he needs to complete tasks. Members of his IEP team, and some community agencies, are planning for Ron's transition when he turns 21.

20

When he is not in a work setting, Ron attends the local high school, where he is friendly, and well-known for his special interest in fly swatters. In fact, both students and teachers have given Ron special fly swatters, and regularly ask him about his unique collection.

**HARRY,** a young man with Asperger syndrome, is graduating from high school with honors. Given the challenges of AS, Harry's success surprises and pleases everyone. In the last few years, Harry has needed only a 504 plan. This federally-mandated plan is used for students whose difficulties are in the mild range. In Harry's case, only a few accommodations are needed, such as preferential seating and extended time on tests. Harry is well aware of his differences, and sees a counselor regularly.  He has two good friends who like and accept him for who he is.

Harry looks forward to going to college, where his serious attitude and excellent reading ability should help him to succeed. Harry's counselor has not only helped him to better understand his Asperger's differences, but also has introduced Harry to an Internet group of others with similar characteristics and traits.

504 Plan:
a program of instructional services to assist students with special needs who are placed in a regular education setting.

----

Students receiving services for autism are as diverse as the interventions they receive, and it's apparent that a diverse group of caregivers delivers these services. Keep in mind that the best services help students attain not only success, but also independence.

It is important to understand that autism is a multicausal phenomenon. There will not be one cure found, but we are finding some pieces of the puzzle. I do not know of miraculous recoveries. In fact, my son would be offended at the thought. He says he is not a failed or broken normal person, he is a perfectly fine person with autism.  And he and the other individuals on the autism spectrum have a lot to contribute to this world.

[Julie Donnelly, Ph.D. has over 24 years of teaching and school consulting experience with all ages and disabilities, specializing in teaching students with autism. She is recognized nationally as an authority on autism. Her son Jean-Paul Bovee is a well-known speaker and person with autism.]

See Dr. Donnelly's website at www.autismsupports.com.

21

# Psychiatric Diagnoses

In order to qualify for medical or insurance services, parents of children with autism spectrum disorders seek professional psychiatric diagnoses. These diagnoses are based on criteria from either the International Classification of Diseases (ICD-10) or the American Psychiatric Association *Diagnostic and Statistical Manual IV* (DSM-IV). Note that psychiatric diagnoses on the following pages are based on DSM-IV criteria.

In addition to the medical diagnosis, a child must be assessed in the educational system, in order to receive special education services. The two sets of diagnostic criteria do not necessarily correlate: a child may be diagnosed with High Functioning Autism as well as Asperger Disorder, or with PDD-NOS as well as Autism.

The inconsistency is due, in part, to the variability of behaviors in the autism spectrum disorder.

While scientists have attempted to diagnose autism based on behavioral characteristics, Dr. Judith Miles at the University of Missouri Autism Project clinic researched a different approach, "separating children who experienced central nervous system insult during [fetal development] from those who did not." In a study of 465 patients admitted to the clinic, Dr. Miles found that approximately 30% of the group display "complex autism," defined as autism in combination with dysmorphology, brain abnormalities, or microcephaly (small head). Children with "essential autism" were defined as those without dysmorphology, brain abnormalities or microcephaly.

**REFERENCE**
Miles and Fennell, "Autism and Jourbet's Syndrome," 2002.

> Comparison of the subgroups suggested higher IQs, fewer seizures and abnormal EEGs, a regressive pattern of onset, higher prevalence for males than females, and higher family recurrence risk for children with **essential** autism. In contrast, children with **complex** autism had lower IQs, more seizures and  abnormal EEGs, a gradual onset, a more even gender distribution, poorer outcome, and a lower familial recurrence risk.          (Miles and Fennell)

In summary, different diagnoses of autism attempt to describe the extensive variants of the disorder, and over time, a child may be assessed and given a different diagnosis.

22

## Autistic Disorder
## (classical autism, Kanner's syndrome)

**syndrome:**
a group of symptoms
indicating a biological
condition

First described in medical literature by Leo Kanner in 1943, autism is a syndrome that includes some element of at least three criteria.

• Some qualitative impairment in reciprocal social interaction. This may be characterized by poor use of eye gaze and gestures, and a lack of interest in (or ability to develop) personal relationships.

• An impairment of communication—verbal and nonverbal—characterized by a delay in language acquisition, lack of (or poor) speech, lack of spontaneous play.

• A restricted repertoire of activities or interests, including repetitive or stereotyped movements—hand flapping, spinning—and preoccupation with specific movements in objects.

Three out of four children with autism also have mental retardation. One in three children with autism will have, or will develop, seizure disorders. Many others may have co-occurring disorders such as allergies, or hearing or visual impairments. Self-injury behaviors may emerge.

Diagnoses among the spectrum of autism disorders include high functioning autism (Asperger syndrome), classical autism (also called Autistic Disorder, Kanner's Syndrome), Childhood Disintegrative Disorder (also called Heller's Disorder), or Pervasive Developmental Disorder-Not Otherwise Specified (PDD-NOS).

## Childhood Disintegrative Disorder
## (Heller's Disorder)

This rare diagnosis refers to a child having normal development who suddenly regresses, or fails to meet developmental milestones, at around age two. It is difficult to ascertain if this is an independent condition, since a pattern of normal development and later regression is often identified in autism spectrum disorders. (See the classifications of Dr. Judith Miles, page 21.)

23

# Asperger syndrome
# High-functioning Autism

*The difference between Asperger's and high functioning autism is … the way they are spelled.*
—Tony Attwood, in *Asperger's Syndrome: A Guide for Parents and Professionals.*

Asperger syndrome (AS) or Asperger Disorder [DSM-IV] represents a constellation of symptoms or characteristics at the "higher-functioning" end of the autism spectrum of pervasive developmental disorders, which is medically diagnosed by the presence of the majority of following traits:

- Unusual responses to stimulation and environment. A person with AS may be extremely sensitive to noise, smell or taste, and will respond to sensory overload with a meltdown or withdrawal.
- Limited interests or unusual preoccupations. People with high functioning autism tend to specialize on whatever they find interesting; they tend to "spout off" information.
- Repetitive routines or rituals. For a person with AS, ritual and routines provide comfort and predictability in a world that threatens his or her sense of control. If the routine is broken, typically, the person with high functioning autism may respond by having a meltdown.
- Speech and language peculiarities, such as tics or repetitive words or phrases.
- Uncoordinated or repetitive physical movements: walking on toes, flapping hands, fidgeting or facial tics.
- Impaired social and communication skills, such as the inability to "read" the facial expressions or body language of others; or the inability to intuit the rules ("give and take") of conversation.
- Lack of flexibility. People with high functioning autism interpret life literally. They rely on a schedule and structure. Often they have a "Plan A" but not a "Plan B."

A person with Asperger syndrome faces a new set of problems during adolescence, when peer pressure and "fitting in" take precedence over individuality. It can be difficult for people with high functioning autism to form relationships, often resulting in feelings of loneliness and frustration. It's not unusual for a person with AS to develop depression or anxiety. That being said, people with Asperger syndrome very often enjoy intimate relationships, and excel in their fields of interest.

24

# Pervasive Developmental Disorder
# Not Otherwise Specified (PDD-NOS)

Pervasive Developmental Disorder, Not Otherwise Specified (PDD-NOS) is called a "subthreshold" condition. PDD-NOS is a diagnosis indicating that a child's symptoms fall within the Autism Spectrum Disorder. For a PDD-NOS diagnosis, some—but not all—features of autism or another Pervasive Developmental Disorder must be identified.

Not all children with PDD-NOS have the same degree or intensity of the disorder: a child may show a few symptoms at school or in a neighborhood environment. Other children may exhibit more behaviors, and may have difficulties in all areas of their lives. (NICHY)

Information from the Yale Child Study Center web site notes:

*While deficits in peer relations and unusual sensitivities are typically noted, social skills are less impaired than in classical autism. ... The limited available evidence suggest that children with PDD-NOS probably come to professional attention rather later than is the case with autistic children, and that intellectual deficits are less common.*

Speech problems are common in young children, but often diminish as the child gets older. Often children have a monotone or robotic speech inflection.

Intelligence and cognitive abilities vary among individuals.

Emotional expression of some children may be "flat," excessive or inappropriate to the situation, yet children with PDD-NOS can also express affection and humor.

Typical behaviors of children with PDD-NOS may include, to some degree:

- Resistance to change. Meltdowns are common when the routine is altered.
- Ritualistic or compulsive behaviors, such as "stimming."
- Intense attachments and preoccupations. A child may be fascinated with light bulbs or a certain toy.
- Unusual responses to sensory experiences. Some kids may hate to be touched, but will enjoy roughhousing.
- Movement disorders such as hand flapping, rocking and swaying, or head rolling or banging.

NICHY:
(National Dissemination Center for Children with Disabilities)
www.nichcy.org/pubs/factshe/fs20txt.htm

25

# Rett syndrome

Rett syndrome is a pervasive developmental disorder that causes mental retardation and developmental degeneration. Inherited as an X-linked trait, it has been reported only in females.

*Since the discovery of the MECP2 gene, [implicated in] Rett's, variants of the syndrome have been reported in males who have mutations of MECP2, with some overlap in the symptomatology observed in girls (Amir, et al, 1999; Schwartzman et al, 1999; Schanen et al, 1998).* (Yale Child Study Center)

Infants with this disorder appear to have normal growth and development for at least five months. Parents may notice excess levels of hand patting, waving, and involuntary movements of the fingers, wrists and arms; however, these signs are subtle and may go unnoticed. At five months, there is a slowing of normal development and a failure to reach developmental milestones on time. Additionally, parents note the following signs:

• size of the child's head does not grow as much as it should between the ages of 5 and 48 months;

• loss of previously learned, useful hand skills (such as reaching for and grasping an object), and the development of stereotyped hand movements, especially hand wringing;

• loss of socially engaging behaviors like smiles and eye contact (however, these behaviors may redevelop later);

• loss of coordinated walking or body movements.

Additionally, expressive and receptive language skills become impaired, and severe psychomotor retardation develops.

A lack of interest in social relationships, loss of expressive language and the development of "stereotypies" can cause this disorder to be confused with classic autism.

**RESOURCE**
International Rett Syndrome Association
9121 Piscataway Road
Clinton, MD 20735
1-800-818-RETT
www.rettsyndrome.org

26

# Neurological Disorders

Neurological disorders of the brain may co-occur with autism spectrum disorders (ASD). Often a child with autism will display ADD/ADHD behaviors. Anxiety and panic disorders (as well as headaches) are common responses to sensory overload, and may accompany ASD. Individuals with ASD may develop mood disorders such as depression and dysthymia (chronically irritated, slightly depressed mood).

### Attention Deficit Disorder (ADD)
### Hyperactivity Disorder (HD)
### Attention Deficit/Hyperactivity Disorder (ADHD)

Attention deficit disorders are neurological brain disorders that make it difficult to sit still, stay focused, remember instructions, play quietly or get along with others. These are treated with a combination of behavioral modifications, classroom interventions, and/or medication. For diagnosis, a person must exhibit characteristics of ADD or ADHD in more than one setting—in both school and home, for instance.

A person diagnosed with **attention-deficit disorder** (ADD) fails to pay attention to details; has difficulty sustaining interest in tasks or play; will not follow through on instructions; procrastinates; is easily distracted; and is forgetful.

With **hyperactivity disorder**, a person typically fidgets or squirms; has difficulty playing quietly; often talks excessively; interrupts or intrudes on others, and displays a lack of ability to inhibit impulses.

**Reference:**
For a detailed discussion of childhood brain disorders, see "The ABCs of Children's Mental Health" (2001) from Project LIFE.

## Depression

Depression is characterized by a depressed or irritable mood most of the day, every day, for at least a year. In addition, a child will have sleep problems; will lose or gain weight; will feel restless; have fatigue or loss of energy; have feelings of worthlessness or excessive guilt; or have diminished ability to think or concentrate. Someone with depression may also have recurrent thoughts of death or suicide, or will make suicide attempts.

Depression is often accompanied by headaches (40% of females), general physical complaints or gastrointestinal problems.

27

## Obsessive-Compulsive Disorder

Obsessive-compulsive disorder (OCD) is characterized by anxious thoughts or rituals that cannot be controlled. People with OCD may be plagued by persistent, unwelcome thoughts or images, or by the urgent need to perform certain rituals such as hand-washing, checking, counting or ordering. Many of the behaviors associated with OCD are also typically seen in autism. Research studying the similarities between autism and OCD behaviors suggests a "similar biobehavioral model in place in both autism and obsessive-compulsive disorder." (Winter and Schreibman)

## Schizophrenia

While symptoms of schizophrenia usually appear in late adolescence, in rare cases childhood schizophrenia may be misdiagnosed as an autism disorder.

Schizophrenia is noted by:
- Hallucinations—usually visual or auditory, rarely olfactory
- Delusions—false beliefs, paranoia
- Disorganized speech, incoherence
- Disorganized or catatonic behavior
- Negative symptoms, specifically flat affect, lack of speech
- Marked impairment of at least six months duration

## Tourette syndrome (TS)

Tourette Syndrome is an inherited neurological disorder characterized by repeated involuntary movements and uncontrollable vocal sounds, called tics. Symptoms of TS appear before the individual is 18 years old, often when the child enters school.

Like autism, Tourette syndrome (which occurs mainly in males) affects behavior, social interaction, movement and language. It is not a component of autism, but can be misdiagnosed as autism.

"Repetitive movements, stereotypies, [echolalia], self-injurious behaviors and compulsive behaviors are common in autistic spectrum, [as well as] a subset of severe TS without autism." (Barnhill and Horrigan)

Both syndromes are thought to have complex genetic and environmental origins. Research "suggests a genetic relationship between autism and Tourette syndrome, as well as a genetic relationship of both with disorders of immune dysregulaton." (Becker et al.)

28

# Glossary

**ABA (Applied Behavior Analysis):** Acronym used to refer to a family of techniques based on behavioral principles.

**aphasia:** Loss of ability to use or understand words.

**atypical autism** : A general term for conditions that are similar to (but don't quite fit) the set of criteria for a diagnosis of autism or related disorders. (See PDD-NOS)

**Auditory Integration Training (AIT):** A technique used to relieve hearing dysfunctions by "retraining" the ear to hear in a more balanced fashion. *Also used: Tomatis, Berard, Samonas training*

**Augmentative and Alternative Communication (AAC):** Any method of communicating that can supplement the ordinary methods of speech and handwriting, where these are impaired. AAC devices range from low-tech ("photo boards" and picture exchange communication) to "high tech" (augmentative speech device).

**Autism Diagnostic Interview (ADI):** A standardized, semi-structured parent interview that can be used to assess children and adults with a mental age of 18 months and up.

**Autism Diagnostic Observation Schedule (ADOS):** A standard, semi-structured play session that allows the examiner to observe communicative and social behaviors that are associated with autism.

**autistic savant:** A rare condition in which an individual with autism displays a brilliant talent or intelligence in a particular area, such as feats of memory, mathematics or music.

**Central auditory processing disorder (CAPD):** A hearing impairment located in the brain (where incoming speech is "processed" and understood), rather than in the ear.

**Childhood Autism Rating Scale (CARS):** A rating scale developed to diagnose autism, based on ratings in 15 areas.

29

**chromosomes:** Structures in the cell nucleus that bear an individual's genetic information.

**Diagnostic and Statistical Manual IV (DSM-IV):** The official system for classification of psychological and psychiatric disorders prepared by and published by the American Psychiatric Association.

**discrete trial:** A short, instructional training, which has three distinct parts: a direction, a behavior, and a consequence. Many discrete trial programs rely heavily on directions or commands as the signal to begin the discrete trial.

**dyspraxia:** Impaired or painful functioning in any organ.

**echolalia:** Repeating words or phrases heard previously. The echoing may occur immediately after hearing the word or phrase, or much later. **Delayed echolalia:** can occur days or weeks after hearing the word or phrase. **Functional echolalia:** using a quoted phrase in a way that has shared meaning, for example, a child who sings the Barney jingle to ask for a Barney videotape, or says "Get your shoes and socks" to ask to go outside.

**electroencephalogram (EEG):** A test that uses electrodes placed on the scalp to record electrical brain activity. It is often used to diagnose seizure disorders or to look for abnormal brain wave patterns.

**Fragile X Syndrome:** A genetic disorder that shares many of the characteristics of autism.

**gene:** Formed from DNA, genes are carried on the chromosomes and are responsible for the inherited characteristics that distinguish one individual from another.

**hyperlexia:** The ability to read at an early age, but not necessarily to understand what is being read. **hypo-:** inability to read.

**hypotonia:** low muscle tone.

30

Glossary

**Individualized Educational Plan (IEP):** A plan that identifies the student's specific learning expectations and outlines how the school will address these expectations through appropriate special education programs and services. The IEP also identifies the methods by which the student's progress will be reviewed. For students 14 years or older, the IEP must include a plan for the transition to postsecondary education or the workplace, or a plan to help the student live as independently as possible in the community.

**Landau-Kleffner Syndrome:** Also known as acquired aphasia with convulsive disorder, it is characterized by a progressive loss of the ability to understand language and to use speech, following a period of normal speech development. It is accompanied by seizure activity and is typically diagnosed through a sleep EEG.

**macrocephaly:** A head circumference two standard deviations above average.

**mainstreaming:** Placement of a child with a disability in a regular classroom.

**microcephaly:** A head circumference two standard deviations below average, producing an abnormally small head and small brain.

**occupational therapy (OT):** Provided by an occupational therapist, OT aids in development of the fine motor skills used in daily living. Occupational therapy can focus on sensory issues (e.g., coordination of movement, balance) and on self-help skills such as dressing, using a fork and spoon, or grooming. OT also can address problems with visual perception and hand-eye coordination.

**perseveration:** Repetitive movement or speech, or obsessing on one idea or task.

**Positron Emission Tomography (PET) Scan:** A scanning device that uses low-dose radioactive sugar to measure brain activity.

**prosopagnosia:** brain-based inability to recognize faces.

**psychomotor:** Relating to motor action directly proceeding from mental activity.

31

Glossary

**sensorimotor:** Pertaining to brain activity other than automatic functions (respiration, circulation, sleep) or cognition. Sensorimotor activity includes voluntary movement, and relates to senses (sight, smell, touch and hearing).

**sensory integration (SI):** A term applied to the way the brain processes sensory stimulation or sensation from the body, and then translates that information into specific, planned, coordinated motor activity.

**serotonin:** A chemical neurotransmitter that regulates mood, as well as the physiological processes of sleep, pain and sensory perception, motor function, appetite, learning and memory.

**Speech-Language Pathologist:** Specialist in the area of human communication. The focus of language therapy is to increase a person's ability to understand and interact with their environment.

**stereotypies:** Excessive repetition (or lack of variation) in movements, ideas, or patterns of speech, especially when viewed as a symptom of certain developmental disorders.

**stim: ("stimming"):** Short for "self-stimulation," a term for behaviors whose sole purpose appears to be to stimulate one's own senses. An example is hand-flapping. Many people with autism report that some "self-stims" may serve a regulatory function, such as calming, adding concentration, or shutting out an overwhelming sound.

**TEACCH (Treatment and Education of Autism and related Communication handicapped Children):** TEACCH methodology is a collection of techniques including highly structured classrooms and visual supports. This approach may be used to enhance receptive communication and sequential memory.

**Theory of Mind:** The ability to understand that others have beliefs, desires, emotions and intentions that are different from one's own, and to interpret these through a process of inferring subtle verbal or nonverbal cues.

**tic:** An involuntary facial expression (constant winking, for instance) or vocalization (grunting, repeating words or sounds).

32

# Bibliography

Attwood, Tony. *Asperger's Syndrome: A Guide for Parents and Professionals.* London: Jessica Kingsley Publishers LTD, 1998.

Barnhill, J. and J.P. Horrigan. "Tourette's Syndrome and Autism: A Search for Common Ground." *Mental Health Aspects of Developmental Disabilities* 5, no. 1 (2002): 7-15.

Bashe, P.R. and B.L. Kirby. *The OASIS guide to Asperger syndrome: advice, support, insights, and inspiration.* New York: Crown Publishers, 2001.

Becker, K.G., B. Freidlin, and R.M. Simon. "Comparative Genomics of Autism, Tourette syndrome and Autoimmune/ Inflammatory Disorders." (2003) Submitted to NINDS.

Bolick, Teresa. *Asperger's Syndrome and Adolescence: Helping Preteens and Teens Get Ready for the Real World.* Gloucester, MA: Fair Winds Press, 2001.

Carey, Benedict, "To Treat Autism, Parents Take a Leap of Faith." *New York Times*, 27 December 2004.

Edelson, Stephen M. "Auditory Processing Problems in Autism." *The Sound Connection*, 7, no. 4, (2000): pp 1-2.

Filipek, P.A. et al. "Practice parameter: Screening and Diagnosis of autism." *Neurology* 55(2000): 468-79.

Grandin, Temple. *Thinking in Pictures and Other Reports from My Life with Autism.* Doubleday: New York, 1995.

Greenspan, Stanley. *Building Healthy Minds,* Perseus Books: New York, 1999.

Heitkamp, Kristen, ed. *The ABCs of Children's Mental Health.* Project LIFE: Columbia, MO. 2001.

Jackson, Luke. *Freaks, Geeks and Asperger Syndrome: A User Guide to Adolescence.* Jessica Kingsley Publishers: London, 2002.

McGovern, John T. "Recreation Access Rights Under the ADA." National Center on Accessibility monograph, published on-line at http://www.ncaonline.org/ncpad/rights.shtml.

Miles, Judith H. and Eileen B. Fennell. "Autism and Joubert Syndrome," *Conference Proceedings: Future Research Directions in Joubert Syndrome,* June 27-28, 2002, New Orleans. Published on-line at http://accessible.ninds.nih.gov/news_and_events/proceedings/Joubert_Syndrome_2002.htm.

Ramey, C. T. and S. Landesman Ramey. "Early intervention and early experience." *American Psychologist* 53 (1998): 109-120.

Smith, T., A. D. Groen and J. W. Wynn. "Randomized trial of intensive early intervention for children with pervasive developmental disorder." *American Journal on Mental Retardation* 105 (2000): 269-285.

Tilton, Adelle Jameson. *The Everything Parent's Guide to Children with Autism.* Avon, MA: Adams Media, 2004.

Vargas, Diana L., et al. "Neuroglial activation and neuroinflammation in the brain of patients with autism." *Annals of Neurology* 57, no. 1 (2005): 67-81.

Volkmar, Fred R. *Healthcare for children on the autism spectrum : a guide to medical, nutritional, and behavioral issues.* Bethesda, MD: Woodbine House, 2004.

Winter, J. M. and L. Schreibman, "An Examination of Repetitive Behaviors in Autism and Obsessive-Compulsive Disorder: Brain and Behavioral Similarities." Presented at IMFAR 2002, Orlando, Florida.

34

# Resources

**ADA (Americans with Disabilities Act)**  www.usdoj.gov/crt/ada/adahom1.htm
For information and technical assistance, call (800) 514-0301.

**Autism Network International (ANI)** http://ani.autistics.org "An autistic-run self-help
and advocacy organization for autistic people."

**Autism Research Institute (ARI)**  www.autismresearchinstitute.com  Fax (619)563-6840;
contact for Defeat Autism Now physicians.

**Autism Society of America** www.autism-society.org
Central Missouri Chapter (660) 429-6409; Western Missouri Chapter (816) 353-7560

**American Speech-Language-Hearing Association**  www.asha.org    1-800-638-8255

**Cure Autism Now!** www.cureautismnow.org    1-888-828-8476; (323) 549-0500

**First Steps** www.dese.state.mo.us/divspeced/FirstSteps/index.html. This Missouri state
program provides services for children (birth to age 3) who have delayed development or
diagnosed conditions associated with development disabilities. 1-866-583-2392

**Governor's Council on Disability**  www.gcd.oa.mo.gov 1-800-877-8249

**Judevine Centers.** St. Louis (314)432-6200; Columbia 1-800-675-4241
Southeast MO (573)339-9300; Southwest MO 1-800-420-7410

**MedLine**  www.nlm.nih.gov/medlineplus/autism.html  National Library of Medicine
information and news on autism.

**Missouri Autism Consultants (MACs)** 1-866-481-3841
On-site consultation to Missouri school districts, for programs for students with autism.

**Missouri Department of Mental Health** www.dmh.missouri.gov
Toll-free 1-800-364-9687.

**Missouri Developmental Disabilities Resource Center** www.moddrc.com
Locate needed services and obtain materials related to developmental disabilities and low
incidence disabilities. MODDRC services are available free to Missourians. 1-800-444-0821

**Missouri Families for Effective Autism Treatment (MO-FEAT)** (314)645-6877
www.MO-FEAT.org  Advocacy and information.

35

**Missouri Family Trust** www.missourifamilytrust.org    1-888-671-1069
The Missouri Family Trust administers a master trust which manages individual special needs trusts for persons with a mental or physical disability.

**MU Autism Clinic** (573)884-1871; 882-6991

**National Alliance for Autism Research**  www.naar.org/naar.asp

**National Center on Birth Defects and Developmental Disabilities** at the Centers for Disease Control and Prevention.  www.cdc.gov/ncbddd/dd/ddautism.htm

**National Institute of Child Health & Human Development.** www.nichd.nih.gov/autism
1-800-370-2943

**National Institute on Deafness and Other Communication Disorders** Information Clearinghouse  www.nidcd.nih.gov    1-800-241-1044; 800-241-1055 (TTD/TTY)

**National Institute of Mental Health** (NIMH) www.nimh.nih.gov  1-866-615-6464

**National Institute of Neurological Disorders and Stroke** (NINDS)
www.ninds.nih.gov   1-800-352-9424

**Online Asperger Syndrome Information and Support** (OASIS)
www.aspergersyndrome.org

**Project ACCESS** www.smsu.edu/access    1-866-481-3841
This project trains professionals who serve children with autism and pervasive developmental disorders. Contact Joanie Armstrong at (417)836-6396.

**Project LIFE.**  www.missouri.edu/~projlife  1-800-392-7348
Project LIFE offers publications, training and consultation on mental health topics, free of charge to Missourians.

**Society for Neuroscience** www.sfn.org    (202) 462-6688 Information and fact sheets available on-line.

**Talk Autism.** www.talkautism.org
Resource for the autism community to share knowledge, information and assistance.

**Yale University Child Study Center** http://info.med.yale.edu/chldstdy/autism/index.html
Information about pervasive developmental disorders.

36

NOTES



A Project LIFE Book     2005

funded by

Missouri Department of Mental Health

# Exhibit 2

USWGO
QANON // DRAIN THE SWAMP
MAKE AMERICA GREAT AGAIN



UNITED STATES DISTRICT COURT CASE NO. 1:13-CR-435-1
MIDDLE DISTRICT OF NORTH CAROLINA

Exhibit in attachment to "MOTION FOR SANCTIONS AND TO VACATE
JUDGMENT IN PLAINTIFF'S/RESPONDENT'S FAVOR -- MOTION AND BRIEF /
MEMORANDUM OF LAW IN SUPPORT OF REQUESTING THE HONORABLE
COURT IN THIS CASE VACATE FRAUDULENT BEGOTTEN JUDGMENT OR
JUDGMENTS"



National Institute of
Neurological Disorders
and Stroke

Search NINDS
**En Español**

## Autism Spectrum Disorder Fact Sheet
Autism Spectrum Disorder Fact Sheet

## What is autism spectrum disorder?
Autism spectrum disorder (ASD) refers to a group of complex neurodevelopment disorders characterized by repetitive and characteristic patterns of behavior and difficulties with social communication and interaction. The symptoms are present from early childhood and affect daily functioning.

The term "spectrum" refers to the wide range of symptoms, skills, and levels of disability in functioning that can occur in people with ASD. Some children and adults with ASD are fully able to perform all activities of daily living while others require substantial support to perform basic activities. The Diagnostic and Statistical Manual of Mental Disorders (DSM-5, published in 2013) includes Asperger syndrome, childhood disintegrative disorder, and pervasive developmental disorders not otherwise specified (PDD-NOS) as part of ASD rather than as separate disorders. A diagnosis of ASD includes an assessment of intellectual disability and language impairment.

ASD occurs in every racial and ethnic group, and across all socioeconomic levels. However, boys are significantly more likely to develop ASD than girls. The latest analysis from the Centers for Disease Control and Prevention estimates that 1 in 68 children has ASD.

**top**

## What are some common signs of ASD?
Even as infants, children with ASD may seem different, especially when compared to other children their own age. They may become overly focused on certain objects, rarely make eye contact, and fail to engage in typical babbling with their parents. In other cases, children may develop normally until the second or even third year of life, but then start to withdraw and become indifferent to social engagement.

The severity of ASD can vary greatly and is based on the degree to which social communication, insistence of sameness of activities and surroundings, and repetitive patterns of behavior affect the daily functioning of the individual.

**Social impairment and communication difficulties**
Many people with ASD find social interactions difficult. The mutual give-and-take nature of typical communication and interaction is often particularly challenging. Children with ASD may fail to respond to their names, avoid eye contact with other people, and only interact with others to achieve specific goals. Often children with ASD do not understand how to play or engage with other children and may prefer to be alone. People with ASD may find it difficult to understand other people's feelings or talk about their own feelings.

People with ASD may have very different verbal abilities ranging from no speech at all to speech that is fluent, but awkward and inappropriate. Some children with ASD may have delayed speech and language skills, may repeat phrases, and give unrelated answers to questions. In addition, people with ASD can have a hard time using and understanding non-verbal cues such as gestures, body language, or tone of voice. For example, young children with ASD might not understand what it means to wave goodbye. People with ASD

1 of 9                                                                                      8/16/2018, 1:47 AM

may also speak in flat, robot-like or a sing-song voice about a narrow range of favorite topics, with little regard for the interests of the person to whom they are speaking.

**Repetitive and characteristic behaviors**
Many children with ASD engage in repetitive movements or unusual behaviors such as flapping their arms, rocking from side to side, or twirling. They may become preoccupied with parts of objects like the wheels on a toy truck. Children may also become obsessively interested in a particular topic such as airplanes or memorizing train schedules. Many people with ASD seem to thrive so much on routine that changes to the daily patterns of life — like an unexpected stop on the way home from school — can be very challenging. Some children may even get angry or have emotional outbursts, especially when placed in a new or overly stimulating environment.

**top**

## What disorders are related to ASD?
Certain known genetic disorders are associated with an increased risk for autism, including Fragile X syndrome (which causes intellectual disability) and tuberous sclerosis (which causes benign tumors to grow in the brain and other vital organs) — each of which results from a mutation in a single, but different, gene. Recently, researchers have discovered other genetic mutations in children diagnosed with autism, including some that have not yet been designated as named syndromes. While each of these disorders is rare, in aggregate, they may account for 20 percent or more of all autism cases.

People with ASD also have a higher than average risk of having epilepsy. Children whose language skills regress early in life — before age 3 — appear to have a risk of developing epilepsy or seizure-like brain activity. About 20 to 30 percent of children with ASD develop epilepsy by the time they reach adulthood. Additionally, people with both ASD and intellectual disability have the greatest risk of developing seizure disorder.

**top**

## How is ASD diagnosed?
ASD symptoms can vary greatly from person to person depending on the severity of the disorder. Symptoms may even go unrecognized for young children who have mild ASD or less debilitating handicaps.

Autism spectrum disorder is diagnosed by clinicians based on symptoms, signs, and testing according to the Diagnostic and Statistical Manual of Mental Disorders-V, a guide created by the American Psychiatric Association used to diagnose mental disorders. Children should be screened for developmental delays during periodic checkups and specifically for autism at 18- and 24-month well-child visits.

Very early indicators that require evaluation by an expert include:

- no babbling or pointing by age 1
- no single words by age 16 months or two-word phrases by age 2
- no response to name
- loss of language or social skills previously acquired
- poor eye contact
- excessive lining up of toys or objects
- no smiling or social responsiveness

Later indicators include:

- impaired ability to make friends with peers
- impaired ability to initiate or sustain a conversation with others
- absence or impairment of imaginative and social play
- repetitive or unusual use of language
- abnormally intense or focused interest
- preoccupation with certain objects or subjects
- inflexible adherence to specific routines or rituals

If screening instruments indicate the possibility of ASD, a more comprehensive evaluation is usually indicated. A comprehensive evaluation requires a multidisciplinary team, including a psychologist, neurologist, psychiatrist, speech therapist, and other professionals who diagnose and treat children with ASD. The team members will conduct a thorough neurological assessment and in-depth cognitive and language testing. Because hearing problems can cause behaviors that could be mistaken for ASD, children with delayed speech development should also have their hearing tested.

**top**

## What causes ASD?

Scientists believe that both genetics and environment likely play a role in ASD. There is great concern that rates of autism have been increasing in recent decades without full explanation as to why. Researchers have identified a number of genes associated with the disorder. Imaging studies of people with ASD have found differences in the development of several regions of the brain. Studies suggest that ASD could be a result of disruptions in normal brain growth very early in development. These disruptions may be the result of defects in genes that control brain development and regulate how brain cells communicate with each other. Autism is more common in children born prematurely. Environmental factors may also play a role in gene function and development, but no specific environmental causes have yet been identified. The theory that parental practices are responsible for ASD has long been disproved. Multiple studies have shown that vaccination to prevent childhood infectious diseases does not increase the risk of autism in the population.

**top**

## What role do genes play?

Twin and family studies strongly suggest that some people have a genetic predisposition to autism. Identical twin studies show that if one twin is affected, then the other will be affected between 36 to 95 percent of the time. There are a number of studies in progress to determine the specific genetic factors associated with the development of ASD. In families with one child with ASD, the risk of having a second child with the disorder also increases. Many of the genes found to be associated with autism are involved in the function of the chemical connections between brain neurons (synapses). Researchers are looking for clues about which genes contribute to increased susceptibility. In some cases, parents and other relatives of a child with ASD show mild impairments in social communication skills or engage in repetitive behaviors. Evidence also suggests that emotional disorders such as bipolar disorder and schizophrenia occur more frequently than average in the families of people with ASD.

In addition to genetic variations that are inherited and are present in nearly all of a person's cells, recent research has also shown that *de novo*, or spontaneous, gene mutations can influence the risk of developing autism spectrum disorder. *De novo* mutations are changes in sequences of deoxyribonucleic acid or DNA, the hereditary

material in humans, which can occur spontaneously in a parent's sperm or egg cell or during fertilization. The mutation then occurs in each cell as the fertilized egg divides. These mutations may affect single genes or they may be changes called copy number variations, in which stretches of DNA containing multiple genes are deleted or duplicated. Recent studies have shown that people with ASD tend to have more copy number *de novo* gene mutations than those without the disorder, suggesting that for some the risk of developing ASD is not the result of mutations in individual genes but rather spontaneous coding mutations across many genes. *De novo* mutations may explain genetic disorders in which an affected child has the mutation in each cell but the parents do not and there is no family pattern to the disorder. Autism risk also increases in children born to older parents. There is still much research to be done to determine the potential role of environmental factors on spontaneous mutations and how that influences ASD risk.

**top**

## Do symptoms of autism change over time?
For many children, symptoms improve with age and behavioral treatment. During adolescence, some children with ASD may become depressed or experience behavioral problems, and their treatment may need some modification as they transition to adulthood. People with ASD usually continue to need services and supports as they get older, but depending on severity of the disorder, people with ASD may be able to work successfully and live independently or within a supportive environment.

**top**

## How is autism treated?
There is no cure for ASD. Therapies and behavioral interventions are designed to remedy specific symptoms and can substantially improve those symptoms. The ideal treatment plan coordinates therapies and interventions that meet the specific needs of the individual. Most health care professionals agree that the earlier the intervention, the better.

**Educational/behavioral interventions**: Early behavioral/educational interventions have been very successful in many children with ASD. In these interventions therapists use highly structured and intensive skill-oriented training sessions to help children develop social and language skills, such as applied behavioral analysis, which encourages positive behaviors and discourages negative ones. In addition, family counseling for the parents and siblings of children with ASD often helps families cope with the particular challenges of living with a child with ASD.

**Medications:** While medication can't cure ASD or even treat its main symptoms, there are some that can help with related symptoms such as anxiety, depression, and obsessive-compulsive disorder. Antipsychotic medications are used to treat severe behavioral problems. Seizures can be treated with one or more anticonvulsant drugs. Medication used to treat people with attention deficit disorder can be used effectively to help decrease impulsivity and hyperactivity in people with ASD. Parents, caregivers, and people with autism should use caution before adopting any unproven treatments.

**top**

## What research is being done?
The mission of the National Institute of Neurological Disorders and Stroke (NINDS) is to seek fundamental knowledge about the brain and nervous system and to use that knowledge to reduce the burden of neurological disease. The NINDS is a component of the National Institutes of Health (NIH), the leading supporter of biomedical research in the

world. NINDS and several other NIH Institutes and Centers support research on autism spectrum disorder.

Nearly 20 years ago the NIH formed the Autism Coordinating Committee (NIH/ACC) to enhance the quality, pace, and coordination of efforts at the NIH to find a cure for autism. The NIH/ACC has been instrumental in promoting research to understand and advance ASD. The NIH/ACC also participates in the broader **Federal Interagency Autism Coordinating Committee (IACC)**, composed of representatives from various U.S. Department of Health and Human Services agencies, the Department of Education, and other governmental organizations, as well as public members, including individuals with ASD and representatives of patient advocacy organizations. One responsibility of the IACC is to develop a strategic plan for ASD research, which guides research programs supported by NIH and other participating organizations.

NINDS and several other NIH institutes support autism research through the **Autism Centers of Excellence (ACE)**, a trans-NIH initiative that supports large-scale multidisciplinary studies on ASD, with the goal of determining the causes of autism and finding new treatments. NINDS currently supports an ACE network focused on ASD and tuberous sclerosis complex (TSC). ASD occurs in approximately half of TSC patients. In particular, the ACE investigators are studying whether certain brain imaging and activity measures in infants diagnosed with TSC can predict the development of ASD. Such biomarkers could aid in understanding how and why ASD occurs in some children but not others, and help to identify patients who might benefit from early intervention. Other ACE centers and networks are investigating early brain development and functioning; genetic and non-genetic risk factors, including neurological, physical, behavioral, and environmental factors present in the prenatal period and early infancy; and potential therapies.

NINDS funds additional research aimed at better understanding the factors that lead to ASD, including other studies on genetic disorders associated with ASD, such as TSC, Fragile X Syndrome, Phelan-McDermid syndrome (which features such autism-like symptoms as intellectual disability, developmental delays, and problems with developing functional language), and Rett syndrome (a disorder that almost exclusively affects girls and is characterized by slowing development, intellectual disability, and loss of functional use of the hands). Many of these studies use animal models to determine how specific known mutations affect cellular and developmental processes in the brain, yielding insights relevant to understanding ASD due to other causes and discovering new targets for treatments.

NINDS researchers are studying aspects of brain function and development that are altered in people with ASD. For example, NINDS-funded researchers are investigating the formation and function of neuronal synapses, the sites of communication between neurons, which may not properly operate in ASD and neurodevelopmental disorders. Other studies use brain imaging in people with and without ASD to identify differences in brain connectivity and activity patterns associated with features of ASD. Researchers hope that understanding these alterations can help identify new opportunities for therapeutic interventions. Additional NINDS researchers are studying the relationship between epilepsy and autism.

Through the National Center for Advancing Translational Sciences (NCATS) **Rare Disease Clinical Research Network (RDCRN)**, NINDS and other NIH Institutes and Centers support a research consortium focused on three rare genetic syndromes associated with

ASD and intellectual disability, including TSC and syndromes involving mutations in the genes *SHANK3* (Phelan-McDermid syndrome) and *PTEN*. The goals of the consortium are to understand shared mechanisms across these syndromes, which may suggest common approaches to their treatment.

NINDS supports autism spectrum disorder research through clinical trials at medical centers across the United States to better our knowledge about ASD treatment and care. Information about participating in clinical studies can be found at the "NIH Clinical Trials and You" website at **www.nih.gov/health/clinicaltrials**. Additional studies can be found at **www.clinicaltrials.gov**. People should talk to their doctor before enrolling in a clinical trial.

More information about research on ASD supported by NINDS and other NIH Institutes and Centers can be found using NIH RePORTER (**projectreporter.nih.gov**), a searchable database of current and past research projects supported by NIH and other federal agencies. RePORTER also includes links to publications and resources from these projects.

**top**

## Where can I get more information?

For more information on neurological disorders or research programs funded by the National Institute of Neurological Disorders and Stroke, contact the Institute's Brain Resources and Information Network (BRAIN) at:

BRAIN
P.O. Box 5801
Bethesda, MD 20824
800-352-9424
**http://ninds.nih.gov**

Information also is available from the following organizations:

**Centers for Disease Control and Prevention (CDC)**
U.S. Department of Health and Human Services
1600 Clifton Road
Atlanta, GA 30333
**inquiry@cdc.gov**
**https://www.cdc.gov/**
Tel: 800-311-3435; 404-639-3311; 404-639-3543

**National Institute of Child Health and Human Development (NICHD)**
National Institutes of Health, DHHS
31 Center Drive, Rm. 2A32 MSC 2425
Bethesda, MD 20892-2425
**http://www.nichd.nih.gov**
Tel: 301-496-5133
Fax: 301-496-7101

**National Institute on Deafness and Other Communication Disorders (NIDCD)**
National Institutes of Health, DHHS
31 Center Drive, MSC 2320
Bethesda, MD 20892-2320
**nidcdinfo@nidcd.nih.gov**
**http://www.nidcd.nih.gov**

Tel: 301-496-7243; 800-241-1044; 800-241-1055 (TTY)

**National Institute of Environmental Health Sciences (NIEHS)**
National Institutes of Health, DHHS
111 T.W. Alexander Drive
Research Triangle Park, NC 27709
**webcenter@niehs.nih.gov**
**http://www.niehs.nih.gov**
Tel: 919-541-3345

**National Institute of Mental Health (NIMH)**
National Institutes of Health, DHHS
6001 Executive Blvd. Rm. 8184, MSC 9663
Bethesda, MD 20892-9663
**nimhinfo@nih.gov**
**http://www.nimh.nih.gov**
Tel: 301-443-4513; 866-415-8051; 301-443-8431 (TTY)
Fax: 301-443-4279

**Association for Science in Autism Treatment**
P.O. Box 1447
Hoboken, NJ 07030
**info@asatonline.org**
**http://www.asatonline.org**

**Autism National Committee (AUTCOM)**
P.O. Box 429
Forest Knolls, CA 94933
**http://www.autcom.org**

**Autism Network International (ANI)**
P.O. Box 35448
Syracuse, NY 13235-5448
**jisincla@syr.edu**
**http://www.autismnetworkinternational.org**

**Autism Research Institute (ARI)**
4182 Adams Avenue
San Diego, CA 92116
**director@autism.com**
**http://www.autismresearchinstitute.com**
Tel: 619-281-7165; 866-366-3361
Fax: 619-563-6840

**Autism Science Foundation**
28 West 39th Street
Suite 502
New York, NY 10018
**contactus@autismsciencefoundation.org**
**http://www.autismsciencefoundation.org**
Tel: 212-391-3913
Fax: 212-228-3557

**Autism Society of America**

USCA4 Appeal: 20-6034    Doc: 6-2    Filed: 01/15/2020    Pg: 86 of 89

4340 East-West Highway
Suite 350
Bethesda, MD 20814
**http://www.autism-society.org**
Tel: 301-657-0881; 800-3AUTISM (328-8476)
Fax: 301-657-0869

**Autism Speaks, Inc.**
1 East 33rd Street
4th Floor
New York, NY 10016
**contactus@autismspeaks.org**
**http://www.autismspeaks.org**
Tel: 212-252-8584; 888-288-4762
Fax: 212-252-8676

**MAAP Services for Autism, Asperger Syndrome, and PDD**
P.O. Box 524
Crown Point, IN 46308
**info@aspergersyndrome.org**
**http://www.aspergersyndrome.org**
Tel: 219-662-1311
Fax: 219-662-1315

"Autism Spectrum Disorder Fact Sheet", NINDS, Publication date September 2015.

NIH Publication No. 15-1877

Back to **Autism Spectrum Disorder Information Page**

**See a list of all NINDS disorders**

**Publicaciones en Español**

**Autismo**

**top**

Prepared by:
Office of Communications and Public Liaison
National Institute of Neurological Disorders and Stroke
National Institutes of Health
Bethesda, MD 20892

NINDS health-related material is provided for information purposes only and does not necessarily represent endorsement by or an official position of the National Institute of Neurological Disorders and Stroke or any other Federal agency. Advice on the treatment or care of an individual patient should be obtained through consultation with a physician who has examined that patient or is familiar with that patient's medical history.

All NINDS-prepared information is in the public domain and may be freely copied. Credit to the NINDS or the NIH is appreciated.

**top**

Date last modified: Tue, 2019-08-13 22:02

Was this page helpful?

○ Yes

○ No

Next

**Form Approved OMB# 0925-0648 Exp. Date 05/31/2021**

**CONTACT US**

**Contact NINDS**
**Visitor Information**
**MORE INFORMATION**

**Archive**
**Site Map**
**En Español**
**National Institutes of Health**
**Department of Health & Human Services**
**Download Adobe Plug-In**
**POLICIES**

**Accessibility**
**Freedom of Information Act**
**Privacy Statement**
**USA.gov**
**FOLLOW**

**Facebook**
**Twitter**
**YouTube**
**Blog**
**RSS Feed**



UNITED STATES
POSTAL SERVICE®

PRIORITY
MAIL

EP14F Oct 2018
OD: 12 1/2 x 9 1/2

P S00001000014

TRACKED*
★ ★ ★
INSURED*
★

FLAT RATE ENVELOPE
ONE RATE ★ ANY WEIGHT*

We Are Q No New World Order
WWG1WGA

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

‡ Domestic only.    ** For Domestic shipments, the maximum weight is 70 lbs. For International shipments, the maximum weight is 4 lbs.







PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP14F © U.S. Postal Service; October 2018. All rights reserved.

U.S. POSTAGE PAID
PM 2-DAY
MARTINSVILLE, VA
24112
OCT 04, 19
AMOUNT
$10.85
R2304N11782I-13

27401

CERTIFIED MAIL

PLEASE PRESS AT TOP OF ENVELOPE TO THE RIGHT OF THE RETURN ADDRESS - FOR APPROVED USE

7015 0640 0006 0646 2519

**U.S.W.G.O.**
Brian Q. Hill — sorry Brian D. Hill — Ally of QA NON
310 Forest Street, Apt. 1
Martinsville, VA 24112

FROM:

INSPECTED

RECEIVED
OCT 04 2019

TO:

Clerk of the Court
U.S. District Court
324 West Market Street, Suite 1
Greensboro, NC 27401

To schedule free
Package Pickup,
scan the QR code.



USPS.COM/PICKUP

UNITED STATES
POSTAL SERVICE®

PRIORITY®
MAIL

- Date of delivery specified*
- USPS TRACKING™ included to many major international destinations.
- Limited international insurance.
- Pick up available.*
- Order supplies online.*
- When used internationally, a customs declaration label may be required.

* Domestic only

EP14F Oct 2018
OD: 12 1/2 x 9 1/2



PS00001000014

This envelope is made from post-consumer waste. Please recycle · again.

* Domestic only.  * For Domestic shipments, the maximum weight is 70 lbs. For International shipments, the maximum weight is 4 lbs.